[Civ. No. 18177. Third Dist. May 29, 1980.]

LUCILLE STONE, Plaintiff and Respondent, v.
LAWRENCE H. FOSTER, Defendant and Appellant.

■■■■■■■■■■

■■■■■■■■■■

**COUNSEL**

Keenan & Tobin, P. Dennis Keenan and William Garcia for Defendant and Appellant.

Gessford, Sevey & Alpar and Leonard Sacks for Plaintiff and Respondent.

**OPINION**

**GROSSFELD, J.**\*—Defendant Lawrence H. Foster, M.D., appeals from a judgment of the Superior Court of El Dorado County entered upon a jury verdict in favor of plaintiff Lucille Stone in an action for medical malpractice and fraud. The judgment awarded plaintiff $50,000 for negligence, and $15,000 punitive damages, from which $4,000 was set off pursuant to stipulation to account for a settlement with another defendant. The trial court entered an order awarding plaintiff costs of $3,500.10.

Defendant contends (1) plaintiff's theory of fraud cannot be sustained and the submission of the case to the jury on that basis requires reversal; (2) the trial court erred in the jury instructions; (3) the trial court erred in excluding certain evidence; (4) the evidence does not support the verdict; (5) plaintiff's counsel was guilty of misconduct and that misconduct requires reversal; and (6) the trial court erred in the award of costs.

Since we reverse the judgment for the reasons hereinafter stated, we do not discuss defendant's contention that the trial court erred in the award of costs.

---

\*Assigned by the Chairperson of the Judicial Council.

■■■■■

## FACTS

In early summer, 1975, plaintiff was a 43-year-old blackjack dealer at Harvey's Resort at Lake Tahoe. Plaintiff's abdomen bore scarring from three prior operations: an appendectomy, a cesarean section birth, and a "tummy tuck" operation. Plaintiff had the "tummy tuck" done to remove excess skin and stretch marks left by the birth of her second child. She was satisfied with the "tummy tuck," except that it left a scar higher on her abdomen than she wished it to be.

Plaintiff heard from a friend that defendant, a plastic surgeon, was practicing in the Tahoe area. Plaintiff went to see defendant to inquire whether anything could be done to remove the scar. She testified that, "He assured me at that time that there was no risk, it was safe, that he could remove that scar, throw it away and put it down further. He says it would be a beautiful job, and he told me, he says, 'You'll be very pleased and happy with the results.'" Plaintiff, relying on defendant's representations, decided to have the surgery done. Plaintiff testified that prior to the operation defendant did not tell her that there would be risks involved, that he told her he had done a number of "tummy tuck" operations and that it was fairly simple.

Plaintiff underwent surgery for a "tummy tuck" on October 24, 1975. The "tummy tuck" operation is a procedure wherein a large patch of skin is removed from the area below the patient's navel; the skin above the navel is detached from the underlying tissue; the muscles are tightened; the skin from above the navel is stretched and pulled down to cover the portion of the abdomen that is exposed; the flaps of skin are sewn together; and a new navel is cut into the skin to which the umbilicus is attached. After the operation, a surgical dressing in the form of a cast is applied to keep the skin flat against the underlying tissue and to prevent pressure on the stitches.

When plaintiff awoke after the operation she was experiencing severe pain on a spot higher on her abdomen than the area of the stitches. Plaintiff's skin began to blister and grew progressively worse. Plaintiff testified that after her release from the hospital defendant came to her home and said, "My God, I made a terrible mistake. I don't know what caused this but whatever it is, don't worry about it, I'll take care of everything for you. Whether it involves more operations or another doctor or whatever you want, I'll take care of this for you and we'll make

sure that your stomach is as smooth as a baby's. Don't worry about it." Plaintiff's condition grew worse before it began to heal, and when it did heal plaintiff was left with large scars on her abdomen.

Plaintiff filed a complaint alleging that her injuries occurred due to medical negligence. Plaintiff subsequently filed an amendment to the complaint to state a second cause of action sounding in fraud. After a demurrer was sustained to the amendment plaintiff filed her first amended complaint to state one cause of action for negligence and one cause of action for fraud.

At trial plaintiff's expert witness, a general surgeon, testified that in his opinion the scars on plaintiff's abdomen would not have occurred in the absence of professional negligence. He testified that on the record available it was rather difficult to determine the cause of the injury that resulted in the scarring, but that since the scarring was not present prior to surgery and appeared immediately thereafter, the surgery must have caused the scarring.

Plaintiff's expert proposed four possibilities of the cause of the injury. The first, and in his opinion most probable, was cast burn. Contact with the skin by a cast can cause a burn, and plaintiff's scars appeared to be burn scars. The second possibility was any minor injury, such as abrasion, with infection. The third possibility was any kind of chemical burn. The final possibility postulated by the witness was burning from beneath the skin by liquid silicone. Plaintiff had her breasts injected with liquid silicone years earlier and liquid silicone tends to migrate. If some of the silicone from plaintiff's breast injections had migrated to her abdomen, when defendant disturbed the flesh under the skin, the silicone could have come in contact with the skin and thus caused the condition.

Plaintiff's expert testified that a plastic surgeon with defendant's training and experience who was aware that plaintiff had earlier silicone injections should have warned her of the risk of the surgery she contemplated. He further testified that when plaintiff's condition did not respond to treatment and grew worse, defendant should have called in a specialist for a consultation. He finally believed that defendant was negligent in leaving plaintiff in the care of a general practitioner while he went to San Francisco after the operation.

Plaintiff relied upon three types of evidence to support her allegation of fraud. The first type was the representations before the surgery that the surgery was safe and that she would be happy with the results. Plaintiff testified that she would not have undergone the surgery had she been aware that there were risks involved. The second type of evidence of fraud concerned defendant's representations after the injury occurred. Plaintiff testified that defendant promised to correct the problem, and that if further operations were necessary he would either perform them or pay to have them performed by another physician. Although defendant did provide further services and never refused to see plaintiff or to perform these promises, plaintiff stopped seeing defendant because she felt she was getting the "run around." Plaintiff's third type of fraud evidence concerned defendant's communications after she retained an attorney. After defendant received a letter from plaintiff's attorney, defendant called plaintiff and told her that defendant would either perform the operations necessary to correct the scarring or would pay for another doctor to do so; defendant offered to perform other types of cosmetic surgery free of charge; defendant asked her to drop her attorney, and told plaintiff that if she did not, he, defendant, would lease his house, plane, boat and surgical equipment to make sure that she would not get anything.[1]

Defendant denied that he had failed to inform plaintiff of the risks involved in the surgery or that he had promised a given result. In fact, prior to the operation plaintiff signed a consent form stating that the nature of the operation had been explained to her and that no warranty or guarantee had been made as to the result or cure. Defendant presented evidence that the injury incurred was not the sort of injury which could have been reasonably predicted from the surgery involved. Defendant's experts testified that X-rays taken shortly before trial showed that the silicone in plaintiff's breasts had migrated, and that the migra-

---

[1]Although not relied upon to establish the fraud cause of action, there was evidence of two other "bad acts" of defendant which plaintiff placed before the jury. Plaintiff repeatedly sought to establish that defendant had used a small injection of liquid silicone to correct a pock mark on her face and that the use of liquid silicone in such a manner violated regulations concerning the use of liquid silicone. There was no evidence that the use of the silicone in any way contributed to plaintiff's injury or caused other problems. Plaintiff further sought to establish that the "tummy tuck" was purely cosmetic surgery and thus not likely covered by her insurance, although defendant procured reimbursement. Defendant testified that in addition to tightening the loose skin and lowering the scar, he repaired a herniated condition of the flesh under the skin, thus giving rise to insurance coverage.

tion of silicone was the most probable cause of the injury. Under defendant's theory, the migration of silicone and the resulting injury were something that were not generally known or expected at the time of the surgery.

The trial court submitted verdict forms to the jury on medical negligence and fraud, with a provision for punitive damages.

The jury awarded plaintiff the sum of $50,000 general damages and the sum of $15,000 punitive damages.

The trial court entered judgment on the verdict and subsequently amended the judgment to provide for a set off of $4,000 due to the settlement of Barton Memorial Hospital as had been stipulated to previously by the parties. Plaintiff submitted a memorandum of costs in which she sought an award of costs which included her expenses for expert witnesses. Defendant moved to tax costs and for a new trial. The trial court denied the motion for a new trial. Although the court granted in part the motion to tax costs, it awarded plaintiff costs for her expert witness fees. Defendant appeals.

I

Defendant contends that the cause of action for fraud was not supported by either the allegations or the evidence. We agree.

The elements of a cause of action in fraud are: (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. (*Harazim* v. *Lynam* (1968) 267 Cal.App.2d 127, 130 [72 Cal.Rptr. 670]. See also *Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; Civ. Code, §§ 1709, 1710.)

Plaintiff introduced evidence that after she had retained an attorney, defendant called her and offered either to correct her condition or to pay for the services of another physician, and that he offered to pay her as much as $1,000 if she would drop the proceeding. Plaintiff further introduced evidence that defendant told her either that he was "judgment proof" or would become so in order to prevent her from recovering a judgment. There was no showing that these representations were not true since defendant was not allowed to fulfill the promises as

plaintiff rejected defendant's offers. There was no evidence of reliance by plaintiff, since she rejected the offer and continued the suit. Finally there was no showing of damage in any manner. It is manifest that these representations do not support a claim of fraud.[2]

Likewise defendant's representations after the surgery but before plaintiff retained her attorney do not support a cause of action in fraud. Plaintiff testified that defendant promised to take care of her problem, that he would either do so himself or pay for another physician to do so. The evidence showed that, in fact, defendant did continue to treat plaintiff after the surgery and the development of the injury. This care consisted of house calls, office visits, and at one point treatment by transplant of human skin from the hospital skin bank. Plaintiff testified that she was never told that defendant would not see her or provide her with further service. After plaintiff's attorney contacted defendant, he again offered to treat plaintiff or to pay for another physician to do so, but plaintiff refused. Such evidence does not support an allegation that defendant made the promises without the intent to perform them. Further, there was no evidence that defendant intended to induce reliance by making these representations. In fact, plaintiff did see other physicians during this time, and contacted an attorney to handle the case, and it is thus clear that no reliance was induced. Finally, the evidence fails to support a finding that plaintiff suffered any damage due to these postsurgical promises. Under such circumstances a cause of action in fraud was not shown or proved.

Plaintiff also contends that defendant's preoperative statements establish fraud. Plaintiff testified that prior to the operation defendant told her that he would lower her scar and make her abdomen as "smooth as a baby's"; that she would be happy with the result, and that the operation was simple and safe. Plaintiff did not attempt to state a cause of action for breach of warranty and did not argue to the jury that defendant was bound by a warranty. It is thus not necessary to consider whether the representations constituted a warranty of the result.

Defendant's representations as to the result of the operation do not support a claim of fraud. Fraud is an intentional tort. (See *Seeger* v.

---

[2]The statements by defendant were made in an effort to negotiate and settle plaintiff's claim and were thus inadmissible under Evidence Code section 1152 as well as failing to support an allegation of fraud.

*Odell, supra,* 18 Cal.2d at p. 414; *Harazim* v. *Lynam, supra,* 267 Cal. App.2d at p. 130.) There was no evidence by which it could be inferred that defendant did not intend to accomplish the exact result he stated, i.e., plaintiff's scar would be lowered and her abdomen would be "as smooth as a baby's." In fact, except for complications, the operation accomplished this result. Plaintiff testified that her scar was lowered to the point she expected and, apart from the lesions, the surgery accomplished the result she expected. The injury was caused by a surgical risk, and it is defendant's representations concerning the risks involved in the surgery which must be examined.

Plaintiff contends that she would not have consented to the surgery had she been informed that the surgery might result in the injury incurred. A physician's duty to inform a patient of the risks involved in a surgical procedure and the resulting cause of action for the failure to do so were carefully considered in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. Therein the Supreme Court indicated that where an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk, the courts are divided on the issue of whether this should be deemed to constitute a battery or to be negligence. (8 Cal.3d at p. 239.) The Supreme Court decided in favor of treatment as negligence, stating at pages 240-241: "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence."

In *Cobbs,* the Supreme Court made a policy decision by which all California courts are bound. (See 8 Cal.3d at p. 240.) The facts involved therein are, in all significant respects, identical with the facts involved herein. The defendant-physician therein discussed the general nature of the operation with the plaintiff, but did not discuss any of the inherent risks of the surgery. After the surgery, complications arose due to certain inherent risks, and the plaintiff sued on the theory that his

consent was vitiated due to his lack of "informed consent," thus result-ing in a battery. The Supreme Court rejected the intentional tort theory and stated: "The facts of this case constitute a classic illustration of an action that sounds in negligence." (8 Cal.3d at p. 241.) In so deciding the Supreme Court relied upon policy factors, including the availability of punitive damages and the possibility of lack of malpractice insurance coverage in an intentional tort situation. (*Id.*, at p. 240.)

Plaintiff herein by pleading fraud sought to do what the Supreme Court refused to allow her to do by pleading battery, that is, to state a cause of action for an intentional tort. The same policy factors which favor treatment as negligence rather than battery also favor treatment as negligence rather than fraud. Plaintiff's case is, as the Supreme Court held in *Cobbs*, a "classic illustration of an action that sounds in negligence." (8 Cal.3d at p. 241.) This is not to say, as defendant con-tends, that a physician's preoperative representations may never amount to fraud. However, that issue need not be determined herein. It is suffi-cient to state that, where a physician fails to disclose low probability inherent risks and subsequent complications arise due to those risks, the resulting cause of action is one for negligence. The evidence disclosed that the risks inherent in the "tummy tuck" operation were low prob-ability. In a survey of 10,490 such operations complications were encountered in only 7.3 percent. In such a situation plaintiff's conten-tion that a cause of action for fraud was shown must be rejected.

## II

**** Defendant contends that the court erred in instructing the jury that, "If you find that plaintiff's injury resulted from a combination of defendant's negligence and an innocent cause, but the injury is not readily susceptible to an allocation between the two causes, defendant has the burden of proving by a preponderance of the evidence the extent of damages resulting from defendant's conduct and if defendant cannot meet this burden, defendant is liable for the entire loss." Defendant ar-gues that this instruction misled the jury into believing that he was required to disprove that his negligence caused the injury.

There were several aspects of defendant's course of dealing with plaintiff which make out a cause of action in negligence. As noted above, defendant's failure adequately to warn plaintiff of the risks in-volved in the surgery made out a classic illustration of an action which

sounds in negligence. (*Cobbs* v. *Grant, supra*, 8 Cal.3d at p. 241.) The injury immediately followed the surgery and there was testimony that the injury was not the sort that would occur in the absence of negligence, thus making out a case for the application of res ipsa loquitur. There was further expert testimony that defendant was negligent in leaving plaintiff in the care of a general practitioner after surgery, and that he was negligent in failing to consult with a specialist when the wounds appeared and he could not ascertain the cause. All of the experts agreed that it was impossible to determine the precise cause of the scarring after the injury had healed and that only possibilities could be stated. This was true because defendant was the only specialist present during the entire course of the surgery and the ensuing injury and any opinion of the cause of the scars would be dependent upon his recollection and reports and the general appearance of the scars, which appeared to be typical third degree burn scars.

Under such circumstances the instruction was properly given. The instruction did not, as defendant suggests, require him to disprove that his negligence caused the injury. The jury was properly instructed that plaintiff had the burden of proving that defendant committed medical negligence and that his negligence was the legal cause of the injury. The court correctly defined legal cause. The instruction to which defendant objects informed the jury that plaintiff must prove negligence and legal cause before the burden would shift to defendant. ▆ It is settled that under California law a negligent tortfeasor is liable for all of the damage proximately caused by his negligence; he may not escape liability merely because another cause, whether innocent or not, contributes to the injury. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 586 [146 Cal.Rptr. 182, 578 P.2d 899].) ▆ Once plaintiff proved to the jury that defendant was negligent and that his negligence was a proximate cause of the injury, it was incumbent upon defendant to prove that he should not be held responsible for some portion thereof. The evidence was more accessible to defendant than to plaintiff and under such circumstances California courts have frequently placed the burden upon the defendant. (*Harris* v. *Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373, 378 [113 Cal.Rptr. 489, 521 P.2d 481]; *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 765 [91 Cal.Rptr. 745, 478 P.2d 465]; *Summers* v. *Tice* (1948) 33 Cal.2d 80, 86 [199 P.2d 1, 5 A.L.R.2d 91]; *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].) There was no error in the instruction.

## III

██ Defendant contends that the jury instructions on causation were argumentative and unduly repetitious.[3] Defendant does not argue that such instructions inaccurately state the law and a reading of the instructions establishes otherwise. An argumentative instruction is one which embodies detailed recitals of fact drawn from the evidence in such a manner as to constitute an argument to the jury in the guise of a statement of law. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 211, pp. 3028-3029.) The instructions in question do not argue the evidence to the jury, rather, they inform the jury of the applicable law and leave it to the jury to determine the facts.

---

[3]The instructions as given to which defendant objects are the following: "A legal cause of an injury is a cause which is a substantial factor in bringing about the injury. There may be more than one legal cause of an injury. When negligent conduct of a defendant contributes concurrently with another cause unrelated to such negligent conduct of defendant the conduct of the defendant is a legal cause of injury regardless of the extent to which each cause contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. It is no defense that the negligent conduct of a person not joined as a party was also a legal cause of the injury.

"If you find in accord with my instruction that the defendant was negligent in affording medical care to plaintiff then you must reasonably compensate plaintiff for damages caused by such negligence.

"It is not necessary that plaintiff demonstrate conclusively and beyond the possibility of a doubt that the negligence of defendant resulted in injury to plaintiff. It is sufficient if you find that by reason of defendant's negligence plaintiff was denied benefits including the possible cure and/or arrest of plaintiff's illness. This is true even if you find that a complete cure would not have resulted from prompt diagnosis and treatment.

"This is true even if the person's condition or disease made her more susceptible to injury from said condition or disease than a normally healthy person would have been.

"If you find in accord with my instruction that defendant was negligent it is not necessary that you find that said negligence was the sole cause of plaintiff's injury. A defendant is liable for any negligence which operates to precipitate, accelerate or aggravate plaintiff's injury, or deprives plaintiff of a benefit including eliminating or reducing the injury by prompt diagnosis and treatment.

"You are not permitted to award a party speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or not reasonably certain.

"However, if you determine that a party is entitled to recover, you should compensate a party for loss or harm which is reasonably certain to be suffered by her in the future as a proximate result of the injury in question.

"A person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, she is entitled to recover damages for any aggravation of such pre-existing condition or disability proximately resulting from the injury.

"This is true even if the person's condition or disability made her more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury.

"Where a pre-existing condition or disability is so aggravated the damages as to such condition or disability are limited to the additional injury caused by the aggravation."

While the repetition of a correct instruction may give the jury the impression that the court considers the subject to be one of special significance and should be avoided, it is rare that such repetition constitutes reversible error. (*Taha* v. *Finegold* (1947) 81 Cal.App.2d 536, 544-545 [184 P.2d 533].) There was no reversible error herein. The jury was instructed that the repetition of an instruction did not imply emphasis and that none should be given. The instructions which were repeated were not unduly repeated but were rather repeated in a different context than first stated. The repetition of the instructions could not have influenced the verdict in an improper manner.

## IV

Defendant contends that the trial court erred in instructing the jury that plaintiff had the burden of establishing by a preponderance of the evidence: "As to plaintiff's theory of fraudulent representation: [¶] (a) That the defendant was fraudulent in regard to his conduct or relations with plaintiff; [¶] (b) That defendant's fraudulent conduct was a proximate or legal cause of injury or damage to plaintiff; [¶] (c) [D]amages." While this instruction is a simplistic definition of the elements of a cause of action for fraud, the trial court fully and carefully instructed on all of the essential elements of a fraud cause of action. There was no error.

Defendant argues that the court erred in refusing to submit its special verdict form to the jury. Appellate courts have commended the utility of special verdicts. (*McCloud* v. *Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928-937 [97 Cal.Rptr. 910]; *Chabot* v. *Meredith* (1971) 15 Cal.App.3d 950, 958 [93 Cal.Rptr. 543].) Nevertheless, the decision whether to submit a special verdict is entirely in the discretion of the trial court. (Code Civ. Proc., § 625.) Reversal may not be predicated upon the court's refusal to submit defendant's proposed special verdict forms.

## V

■ Defendant contends that the trial court erred in instructing the jury on future medical expenses and future loss of earnings as elements of damages. Plaintiff correctly points out that defendant requested the instruction on future medical expenses and thus may not now complain.

(*Correll* v. *Clark Equipment Co.* (1978) 76 Cal.App.3d 548, 553 [143 Cal.Rptr. 269].) It does not appear that prejudice resulted from the instruction on future loss of earnings. Plaintiff did not request an award for future lost earnings; presented no evidence that she might have such lost earnings, and did not argue to the jury that an award should include such damages. It is not reasonably probable that a different result would have occurred in the absence of this instruction. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## VI

Defendant contends that the trial court erred in refusing to allow the testimony of Dr. Iliescu relative to a prior "tummy tuck" operation he had performed on plaintiff. Plaintiff successfully objected to the testimony on the ground that defendant had not disclosed the doctor's name as an expert witness prior to trial pursuant to order of the court.

In proposing to call Dr. Iliescu defendant made it clear to the court that his purpose was to establish that when plaintiff underwent the prior "tummy tuck" operation she had been fully informed as to the risks involved in that type of surgery. Defendant likewise made it clear that he did not intend to ask the witness questions concerning the standard of practice or plaintiff's current condition. The court erred in holding that the witness could not be called because he was an expert that had not been identified at the beginning of trial. Dr. Iliescu was a percipient witness on the issue of whether plaintiff was aware of the risks connected with a tummy tuck, since he would have been the person that previously advised her of such risks.

Plaintiff argues that the testimony was collateral to the issues in the trial court and thus properly rejected. That is not the case. In order for plaintiff to recover for medical malpractice due to defendant's failure to warn of risks there must be a causal relationship between the failure to perform and the injury. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 245.) That relationship must be established by reference to whether plaintiff would have consented to the operation if properly warned and whether a prudent person in plaintiff's position would have done so. (*Ibid.*) Evidence that plaintiff was aware of the risks despite defendant's failure to inform her relates directly to the question of whether she would have

undergone the operation despite a warning from defendant. As such the evidence was not collateral but was directly relevant to an issue in the case.[4]

Plaintiff argues that the trial court had discretion to exclude the testimony under Evidence Code section 352. Under that section a trial court has the discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. As noted above, the evidence was directly relevant to critical issues. Further, it was the only evidence defendant could produce to establish that plaintiff was aware of the risks of the surgery. As such the testimony was highly probative. Defendant assured the court that the testimony would be brief, and it does not appear that the evidence would produce a danger of undue prejudice, of confusing the issues, or of misleading the jury. The exclusion of the testimony cannot be upheld under Evidence Code section 352.

## VII

■■■ Defendant contends that the evidence does not support the verdict. The basis for this contention is the argument advanced by defendant at trial, that the condition was caused by migrated liquid silicone. Dr. Shapiro, plaintiff's expert, testified that migrated silicone was a possible cause of the injury. On cross-examination he stated that the presence of silicone, particularly in the areas of the injury, would confirm the causative agent. Dr. Steinberg, a defense expert witness, testified that X-rays taken just before trial showed the presence of migrated silicone below plaintiff's breasts. Defendant argues that the condition must therefore have been caused by the silicone. Defendant contends that such a cause precludes recovery.

Defendant's contention must be rejected. Each of the experts testified that the exact cause of the injury could not be determined after it had healed. It was thus necessary to testify in terms of probabilities. It could not be conclusively determined that silicone caused the injury.

---

[4]Moreover, evidence that plaintiff was aware of the risks was directly related to the issue of whether she justifiably relied upon defendant's representations in undergoing surgery and was thus directly relevant to the fraud cause of action plaintiff was relying heavily upon at the time of the objection.

Further, the X-rays used by Dr. Steinberg were taken more than two years after the surgery and did not portray the area of the injury. The presence of silicone in an area below the breast but above the area of the injury more than two years after the surgery does not compel the conclusion that silicone was present at the site of the injury or at the time of the injury.

## VIII

We now direct our attention to defendant's contention that plaintiff's counsel was guilty of misconduct and the effects of the fraud allegation being heard by the jury.

The consequences of trying the action on a fraud count as well as negligence were far-reaching. From the opening statement to closing argument plaintiff's counsel continually attempted to portray defendant as an evil person. In opening statement he stated that another girl, Sharon Gimpelson, had the same experience with a terrible surgical result and that despite assurances that he would take care of it, defendant had not done so.[5] During the presentation of evidence plaintiff introduced extensive evidence, unrelated to a negligence cause of action, to portray defendant as an evil plastic surgeon who had moved to Lake Tahoe to take advantage of women caught up in the Tahoe emphasis on youth. Other evidence was introduced to establish that defendant is dishonest and without regard for law and the constitutional rights of others. Plaintiff made reference on numerous occasions to defendant's wealth and status, and his ability to earn large fees from his profession. On numerous occasions the trial court was forced to caution counsel against making asides and the tone of voice with which he addressed witnesses, particularly defendant.

In argument counsel defined defendant as "a doctor, being somebody who holds a position in a community supposedly of public trust, which I have never seen so violated and disgraced in my life, as I have seen through Dr. Foster." Counsel argued at length to portray defendant as an evil doctor backed by the multimillion dollar medical industry and a "conspiracy of silence." In comparison, counsel portrayed plaintiff as an innocent victim of defendant's fraudulent ways, attempting alone to

---

[5]Although the court sustained objection to the testimony of Sharon Gimpelson under Evidence Code section 352, the opening statement clearly informed the jury that other charges were pending and set the tone for the remainder of the trial.

stand up to the vast forces against her and to right the wrongs inflicted upon the community by defendant. Counsel reiterated, "I don't think there's any doubt of how you think I feel about this case. I have never seen conduct on behalf of a defendant so disgraceful in my life, and particularly from a professional man."

Counsel continued his attack upon defendant stating, "This brings us to the whole concept of why I'm so involved in the case. As you know, I don't think there is any doubt, and I realize that you people may be the type that think that doctors walk on water and you're going to think I'm a blithering fool for saying what I'm saying, but I think Dr. Foster was in here solely and purposely to fraudulently do anything he could to get out of this lawsuit." He further stated, "Dr. Foster knowingly violates the law," and he described defendant as arrogant, without concern for the welfare of his patients.

Interwoven throughout counsel's presentation and argument on the fraud cause of action were blatant instances of misconduct by counsel. In his opening statement counsel told the jury that he believed that defendant's only unhappiness with the injury to plaintiff was that it might deter him from getting more business. In discussing the jury's duty to consider the facts he stated: "As I say, much of it is already there, Mr. Keenan knows it, Mr. Garcia knows it, Dr. Foster knows it. It's there. Everybody has been represented."[6]

In examining witnesses, particularly defendant, counsel consistently employed argumentative and improper questioning. For example, when defendant testified that in retrospect he considered the injury inevitable, counsel asked: "In retrospect. You mean now that its happened, you want to look at it and say, 'My gosh, it's like an act of God?'" After asking several more questions on defendant's meaning of inevitable, counsel asked, "Doctor, quite candidly, if you assume that something is inevitable, that's a way of getting you off the hook, isn't it?" In addition to his argumentative manner of questioning, the court was required on several occasions to admonish counsel against the tone in his voice and against making asides. For example, when defendant referred to observation as a diagnostic test the following exchange took place: "Q. I know that, my point is you're calling your looking at something as a diagnostic test; is that correct? A. Yes. That's the art of medicine. Q. The

---

[6]Mr. Keenan and Mr. Garcia were defendant's attorneys.

art? A. Uh-huh (affirmative). Q. Okay. Kind of lousy picture you have, Doctor."

In argument to the jury, in addition to the attempts to appeal to the jury's sympathy and passions we have noted above, counsel leveled attacks upon defendant, his counsel, and his witnesses. On several occasions counsel stated that defendant was disgraceful, the most disgraceful defendant he had ever seen. Apparently referring to courtroom observers counsel stated, "She [plaintiff] doesn't have disfigured patients that I can bring in and have them sit back there hopefully to play on your sympathy, which, to me, was the lowest I have ever seen a defendant in a lawsuit go." Counsel further stated, "Yet, you know there's been, I think, a calculated attempt to portray poverty or destituteness on his part. Every day the same suit; nobody else, none of the jurors, not me, not Lou. The only person who came in here every day with the same suit on outside of our Bailiff and the Court with its black robe was Dr. Foster. He doesn't drive the Pantera, comes up in an old clunky car every day. Doesn't want to be seen in a fancy sports car. I just can't get over in my mind every item that he has done to try and invoke sympathy on your behalf." During the presentation of evidence counsel avoided questions concerning defendant's wealth or assets choosing instead to argue by innuendo, and after defendant's counsel pointed that out to the jury counsel answered, "And he says, 'Why don't I ask Dr. Foster about his assets?' I'll tell you. I don't Mickey—I think he would like—I wouldn't believe one word he said about his assets."

Personal attacks on the character or motives of the adverse party, his counsel or his witnesses are misconduct. (*Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 351 [133 Cal.Rptr. 42].) Likewise attempts to appeal to the prejudice, passions or sympathy of the jury are misconduct. (*Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 605 [136 Cal.Rptr. 787]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 14 [116 Cal.Rptr. 575].) Counsel committed both forms of misconduct during the trial.

It is clear that the jury was influenced by the evidence purporting to establish fraud and by the behavior of counsel since it awarded punitive damages. Nor can it be determined that the compensatory award was not influenced. There was little evidence of expenses incurred or to be incurred by plaintiff due to the injury. The primary element of damages sought was for pain and suffering and the future burden of bearing the scars from the injury. Under such circumstances it is not possible to say

that the jury was not influenced in the amount of the award by the evidence and argument on fraud and by counsel's repeated attempts to generate sympathy for plaintiff and distaste for defendant.

The judgment must therefore be and is reversed.

Puglia, P. J., and Evans, J., concurred.

A petition for a rehearing was denied June 26, 1980, and respondent's petition for a hearing by the Supreme Court was denied August 6, 1980. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.