Filed 6/12/15  Certified for Publication 7/7/15 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| DONN MARTINEZ et al.,<br><br>    Plaintiffs and Appellants,<br><br>      v.<br><br>STATE OF CALIFORNIA,<br>DEPARTMENT OF<br>TRANSPORTATION,<br><br>    Defendant and Respondent. | G048375 (Consol. with G048678)<br><br>(Super. Ct. No. 30-2011-00483327)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James Di Cesare, Judge.  Reversed.

The Homampour Law Firm, Arash Homampour and Wendi O. Wagner; Morey & Upton and Christopher J. Morey for Plaintiffs and Appellants.

Ronald W. Beals, Chief Counsel, Jeffrey R. Benowitz, Deputy Chief Counsel, Glenn B. Mueller and John F. Smith, Assistant Chief Counsel, and Deborah A. Cumba, Deputy Attorney for Defendant and Respondent.

1

## I. INTRODUCTION

This is a case of egregious attorney misconduct.  That word – egregious – is difficult to write, but nothing else seems adequate.  Blessed with a trial judge who allowed it, trial counsel ran roughshod over opposing counsel and the rules of evidence.  We have no choice but to reverse.

Generally, what happened is this:  Defendant's attorney Karen Bilotti would ask a question in clear violation of the trial court's in limine orders.  The question would usually have the effect of gratuitously besmirching the character of plaintiff Donn Martinez.  An objection from Martinez's counsel would follow.  The trial court would sustain the objection.  Bilotti would then ask the same question again.  The trial court would sustain the objection again.  And the same thing would happen again.  And again.  And again.  And again.

Because of the cumulative effect of Bilotti's misconduct we must reverse the judgment Bilotti obtained on behalf of her client, Caltrans.  (See *Gackstetter v. Market S. R. Co.* (1933) 130 Cal.App. 316, 325-327 [cumulative effect of attorney comments constituting misconduct required reversal].)  While Judge Di Cesare showed the patience of Job – usually a virtue in a judge – that patience here had the effect of favoring one side over the other.  He allowed Bilotti to emphasize irrelevant and inflammatory points concerning the plaintiff's character so often that he effectively gave CalTrans an unfair advantage.  Imagine a football game in which the referee continually flagged one team for rule violations, but never actually imposed any yardage penalties on it.  That happened here and requires reversal.

## II. FACTS

A. *Pretrial*

There is a complex freeway interchange in Orange County where three freeways – the Santa Ana, the Garden Grove, and the 57 – all meet, known as the "Orange Crush." According to some editions of the Guinness Book of World Records, the Orange Crush is the most complex road interchange in the world.[1] Plaintiff Donn Martinez was riding his motorcycle as part of a funeral train of motorcycles going from the southeastbound Santa Ana freeway to the eastbound Garden Grove freeway. This particular transition road parallels, and then merges with, a similar transition road coming from the southbound 57 freeway, also heading toward the eastbound Garden Grove. The two transition roads join in an acute angle: As they converge, there is a fairly low (maybe a few inches) raised divider, technically called a "B4 curb," that separates the two roads. A sports utility vehicle might have no problem going over this low "B4 curb," but plaintiff alleged a motorcyclist could lose control if he or she collided with it, particularly if its presence was unexpected because of low visibility.

According to Martinez, as he was riding on the Santa Ana to Garden Grove transition road at dusk, he hit the curb, lost control of his motorcycle, and was injured. He testified that because it was dusk he did not see any yellow lines or the curb itself, nor was the area lighted. Martinez said it "was dark."

The accident occurred when members of the funeral train in front of Martinez started to move over to the 57-connector road from the Garden Grove-connector road on which they were traveling. Martinez "looked and checked towards the 57 and started to move over" when he hit the raised divider and lost control. In June 2011, Martinez and his wife Irene Edens brought this action against Caltrans, contending the B4

---

[1] See Haldane, *A Gnarly Record for the Orange Crush*, L.A. Times (July 21, 1997) ["Critics have described it as 'nightmarish,' and 'dreaded' has almost become part of its name. Commuters curse it. Now, the 1998 edition of the Guinness Book of World Records has given the notorious Orange Crush a new description: the most complex highway interchange in the world."]. (See http://articles.latimes.com/1997/jul/21/news/mn-14792.)

curb constituted a dangerous condition of public property, particularly dangerous to motorcycles.

In preparation for trial, Martinez's attorney was evidently concerned with some of the cultural baggage associated with motorcyclists – including the very group with which Martinez was riding. The funeral train was a group ride affiliated with the "Set Free" ministries, whose members or adherents are sometimes called the "Set Free Soldiers."[2] Martinez has been ordained as a minister by Set Free ministries. Martinez testified his motorcycle was used to attract the attention of young people in his church work. The logo of the Set Free Soldiers is a rather fearsome, skull-like face wearing – and we choose our words carefully here – World War II German-style military helmet. These are sometimes called "Fritz helmets," and do not look much different in silhouette from the advanced combat helmet currently used by the American Army. The Set Free Soldier logo appeared on Martinez's motorcycle in at least two prominent places: on the casing that holds the headlight at the front of the bike and on top of the gas tank right over the engine. The logo is also clearly visible on a relatively large tag attached to the key of the motorcycle as it hangs just under the seat.

Accordingly, Martinez's counsel brought several in limine motions. One sought to exclude any references to Martinez's "membership in any motorcycle club/gang or the stickers/emblems" of that gang. Counsel also sought to exclude information about his termination of employment from a school district years before, in 2003. Both motions were granted. Also granted was a motion to exclude hearsay statements from medical reports. Further, and more generally, Martinez's counsel also sought – and obtained – a prohibition of evidence or testimony designed to elicit

---

[2]     Martinez's counsel's concern was reasonable. The Set Free Soldiers have been known to take on the Hell's Angels (*People v. Heslington* (2011) 195 Cal.App.4th 947) and a jury might think of them primarily as a motorcycle gang if they were reminded often enough.

4

sympathy from the jurors for Caltrans, including its allegedly strapped financial condition.

B. *Trial*

1. *Opening Statement: Among Other Things, Allusions to Defendant's Financial Status*

In her opening address to the jury, Bilotti made eight statements which were improper. Two were broad statements of law that, without some qualification, conveyed to the jury the idea Caltrans was totally immune from all claims. Three of the statements implied that any accident that took place because a motorcyclist hit the divider *necessarily* had to have arisen from the motorcyclist being negligent. The worse were three which emphasized the state's dire financial condition in the context of saying there was no money to replace the divider regardless of its dangerous vel non.

2. *Cross-Examination of Martinez: Gratuitous Absenteeism References*

Prior to Bilotti's cross-examination of Martinez, the trial judge had made an in limine order putting the entire subject of Martinez's 2003 termination from a school district off limits. We count no less than *10* direct violations of the judge's in limine order in the course of her cross-examination. All the violations and references occurred *after* a series of sustained objections and clear admonitions from the trial court.

3. *Cross-examination of Martinez's Wife: More Gratuitous Absenteeism References*

When Bilotti cross-examined Martinez's wife, Irene Edens, she repeatedly brought up the topic of the 2003 termination. We count 13 violations of the in limine motion not to ask Martinez about the 2003 termination, 12 of them after sustained objections. It appears Bilotti asked virtually the same question (previously objected to, objection sustained) about 10 times.

4. *The Nazi Reference*

In forensics there is what has become known as "Godwin's Law." Broadly speaking, Godwin's law is that the first side in an argument to compare the other side to Hitler or the Nazis loses.[3] Apparently unaware of this rule, Bilotti used Martinez's damaged motorcycle to make a gratuitous, out-of-the-blue attempt to link Martinez to Nazis.

The Nazi reference came at the end of Bilotti's cross-examination of Martinez's wife Irene Edens. Bilotti's apparent strategy at that point in the trial was to undercut the positive associations that had been built up by previous testimony mentioning Martinez's ordination as a clergyman. Bilotti wanted to juxtapose those associations against the tough-guy logo of the Set Free Soldiers as plastered on Martinez's motorcycle. So, during her cross-examination of Edens, Bilotti made reference to a certain exhibit 2.6. The exhibit, as shown in our record, is a picture of Martinez's motorcycle showing the Set Free Soldiers logo on the gas tank and also (prominently) on the key chain. Martinez had already testified he spent a year in preparation for his ordination by Set Free ministries by studying the Bible and the license plate on the motorcycle had the (Biblically ironic) appellation, "THE EVL 1."[4]

Thus, after recounting Martinez's wife's testimony about Martinez's work as a clergyman, Bilotti showed exhibit 2.6 to Irene Edens, and asked the judge to "publish" it, i.e., show it to the jury. There was an immediate objection, and the trial judge – prudently – said he would defer the matter until after the break where he could consider it further.

---

[3] See The Atantic, Goldberg, *First Person to Invoke Hitler Loses* (July 24, 2009), http://www.theatlantic.com/international/archive/2009/07/first-person-to-invoke-hitler-loses/21892 (as of Oct. 8, 2014). For a serious discussion of in-court references to Hitler and the Nazis, including the problem of ad hominem attacks, see Teninbaum, *Reductio ad Hitlerum: Trumping the Judicial Nazi Card* (2009) 2009 Mich. St. L. Rev. 541.

[4] The devil is referred to as "the evil one" in some translations of two New Testament passages. (See II Thessalonians 3:3; I John 5:19.) The trial judge showed remarkable insight as to the license plate. He guessed, probably accurately, that it was the motorcycle itself that was being analogized to the devil.

Frustrated by the trial judge's unwillingness to let her show the picture of the cycle immediately to the jury, Bilotti immediately played the Nazi card. She asked: "At the time of the accident, the motorcycle that your husband was riding had a skull picture on it wearing a Nazi helmet; right?"

5. *The Argument on the Motion for Mistrial*

The Nazi reference was the last straw for Martinez's long-suffering trial counsel. Outside the presence of the jury he asked the judge to declare a mistrial. In the ensuing argument on the motion, Bilotti plainly argued she was entitled to besmirch Martinez's character in order to counteract any favorable impression that the jury might have gotten of Martinez because of his work with Set Free ministries and his ordination as a clergyman of that group. Despite the actual admissions that the Nazi reference had been made to attack Martinez's *character* and the bell having been rung, the trial judge denied the mistrial motion, and took no action to rein counsel in.

6. *Closing Argument: More Appeals Based on the Financial Interest of the State*

In Bilotti's closing argument five statements crossed the line. Two followed the pattern begun in opening statement of implying that Martinez was necessarily negligent, two slyly let the jury know that Martinez was uninsured and so the state would have to pick up the tab for his injuries if it found in his favor, and the fifth was a not-so-sly reiteration of the same point.

7. *Closing Argument: The Nazi Reference Resurfaces*

Martinez's counsel thought it necessary to decry the earlier Nazi reference during his closing argument to the jury. Bilotti seized the opportunity in her own closing to reinforce the association. Whereas before the Nazi reference was only to a helmet, and was isolated, Bilotti now exploited the opportunity to psychologically link Martinez to

Nazis by paraleptically using the word "Nazi" six times in rapid succession.[5] And this time the link was stronger – Bilotti wasn't just referring to a mere article of clothing but to Martinez himself.

## 8. *Post-trial Events*

The jury returned a defense verdict, stopping with a negative answer to the very first question "Was the property in a dangerous condition at the time of the incident?" Martinez brought a motion for new trial based on attorney misconduct, the motion was denied, and this appeal timely ensued.

## III. DISCUSSION

### A. *Misconduct*

The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury. (*Seimon v. Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 605.) In more concrete terms, attorneys cannot make appeals based on irrelevant financial aspects of the case such as the hardship that would be visited on a defendant from a plaintiff's verdict (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 551-553 [defense counsel argument defendant might end up in a home for the indigent was attorney misconduct]) or the hardship that would be visited on a plaintiff from a defense verdict (*Hart v. Wielt* (1970) 4 Cal.App.3d 224, 234 [plaintiff's counsel's argument plaintiff would be a "a burden on the taxpayers" lest jury find in her favor was attorney misconduct]). An attorney representing a public entity commits misconduct by appealing to the jurors' self-interest as taxpayers. (E.g., *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 177 [argument that plaintiff's

---

5    Paralepsis is a formidable Greek word for the rhetorical trick of making a point by telling your audience you don't want to make that very point. One of the most famous examples is from Marc Anthony's famous Romans-lend-me-your-ears speech. Anthony says he came to bury Caesar, not praise him. No, the whole point of the speech, in context, is that he really did come to *praise* Caesar, and thereby whip up the crowd against Caesar's assassins. (See Bridges and Rickenbacker, The Art of Persuasion (1991) at p. 90 ["Nor is it incumbent upon us to mention that paralepsis is the habitual refuge of the courtroom mechanic, who abuses it in order to suggest to the jury what he can very well deny to the judge ever having said."].)

8

verdict would mean that "public services" would start disappearing held misconduct].) Similarly, it is misconduct to appeal to the defendant's perceived ability to pay any judgment with ease. (*Stone v. Foster* (1980) 106 Cal.App.3d 334, 335.)

The rule also manifests itself by prohibiting irrelevant ad hominem attacks. Thus a defense attorney commits misconduct in attempting to besmirch a plaintiff's character. (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 531; *Stone, supra*, 106 Cal.App.3d at p. 335.) Attorneys are not to mount a personal attack on the opposing party even by insinuation. (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1246.)[6]

Did Bilotti commit misconduct in this case? Let us count merely the most obvious ways. In just her opening statement there were three appeals to the jurors' interest *qua* taxpayers in her references to Caltrans' financial situation. She did it thrice again in closing argument. Then there were the more than 10 references during her cross-examination of Martinez on the irrelevant topic of Martinez's supposed discharge from a job in 2003, and a similar number during her cross-examination of Martinez's wife. Those references were all in the wake of an in limine ruling prohibiting them and repeated sustained objections.

What is particularly egregious about Bilotti's idée fixe on the topic of Martinez's supposed absenteeism is that she had no reason to harp on the topic *except* to insinuate he was lazy and irresponsible. If Bilotti was following classic defense strategy, she would have sought to establish that Martinez was in poor health as far back as 2003, as a way of arguing the accident didn't leave him much more worse than before. And if that was the case, she would have had reason to affirmatively *avoid* the word "absenteeism." The idea of "absenteeism" and suggestions those absences were not health related would show Martinez was in reasonably *good* health in 2003, and would

---

6       The impeachment of an opposing party's credibility is, of course, perfectly allowed when relevant, even though impeachment does not always reflect well on the party's character.

thus normally underscore the *severity* of the injuries for which he was suing Caltrans. The only reason to continually return to the topic of absenteeism was to insinuate that Martinez was using the accident to scam the legal system for money. If that is your strategy, you have to do it openly – not by innuendo and insinuation.

Then, of course, there was the pièce de résistance, the Nazi reference. Here the misconduct was particularly egregious for two reasons: the context in which the reference was made, and Bilotti's later admission about the reason she brought it up. First, the context. At the time, the focus of the trial was on the condition of Martinez's motorcycle after the accident. Yes, the condition of the bike was obviously relevant. So far so good. But there was no dispute over the *identification* of the bike, and the trial judge wisely noted the picture of the motorcycle could be redacted to omit the Set Free Soldiers logo and "evil one" license plate. But the picture wasn't going to be shown to the jury before the judge himself had time to think about how to handle it. The interval meant Bilotti was about to lose her opportunity to smear Martinez using the Set Free Soldiers logo. And so, *completely gratuitously*, she described the logo in terms of a "Nazi" helmet. It was, in short, a cheap shot deliberately taken before the judge had a chance to prevent it.

And second, the motive. Bilotti was quite candid on the record before the trial judge. She admitted she *wanted* to besmirch Martinez's character because some positive evidence had come in (his church work) which tended to put him in a good light and – though she didn't say this explicitly – counteract the easily exploitable image of the plaintiff as a stereotypical low-life biker.

We have recounted the truly egregious, indisputable instances of misconduct. Martinez, in this appeal, asserts there is yet more.[7] But we see no reason to go further. Suffice to say we found enough to establish attorney misconduct at least five pages ago.

B. *Prejudice*

Obviously attorney misconduct is more common than *reversal* for attorney misconduct. Prejudice must be shown. (See *Garcia v. ConMed Corp., supra,* 204 Cal.App.4th at p. 149 ["But it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial."].)

In *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 320-321, our Supreme Court set forth a list of factors bearing on whether attorney misconduct is prejudicial, and that list remains the go-to criteria. (See *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149). The list is: (1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances. In ascertaining prejudice, the reviewing court makes an independent determination (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872) in light of the overall record (*Sabella, supra*, 70 Cal.2d at p. 320). Here, three of the four *Sabella* factors weigh – indeed heavily weigh – on the side of prejudice. The fourth is more evenly balanced, but still tilts toward prejudice.

Factor 1, the nature and seriousness of the misconduct. Bilotti just kept asking the same question over and over again, oblivious to the trial judge's repeated rulings and admonitions. That was directly disrespectful, almost as if Bilotti were *daring*

---

7       Most notably Martinez points to two more significant sets of misconduct: (1) Bilotti misrepresented the evidence by continually assuming that Martinez was necessarily negligent, and (2) she overstated Caltrans legal position by suggesting to the jury that Caltrans enjoys absolute, unqualified immunity from all causes of action.

11

the trial judge to take some action to stop her. What is particularly egregious about these repeated refusals to heed the judge's ruling is that Bilotti was exploiting qualities that are usually associated with *good* judging. (See *Bloom v. State of Illinois* (1968) 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 ["Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament."].) In a word, she was taking advantage of this judge's good nature.

Factor 2, the general atmosphere including the judge's control of the trial, also weighs heavily in favor of reversal. By simply ignoring the trial judge's rulings, Bilotti made it inevitable that the jury would conclude it didn't have to pay attention to the trial judge either. After all, defense counsel was repeatedly ignoring what he told her in front of their very eyes and getting away with it. He took no corrective action whatsoever. The authoritative force of his instructions was seriously diminished by Bilotti's conduct.

Factor 3, the likelihood of actual prejudice, is a bit more balanced, if only because we cannot say a plaintiff's verdict was a foregone conclusion.[8] But here is where the character attacks add ballast to our conclusion the misconduct was prejudicial. The jury could feel *comfortable* crediting the defense expert's view of the divider, secure in the knowledge that Martinez was just a low-life biker with an affinity for "Nazi" paraphernalia.

Finally factor 4, the efficacy of objections or admonitions, clearly weighs in favor of reversal. Ms. Bilotti simply ignored the trial court's rulings and since there was no penalty for doing so, she was able to infect the case with extraneous matter.

---

[8] There is an argument in Martinez's opening brief we may summarily reject in this footnote. The argument is that Caltrans presented no evidence the placement of the divider was actually reasonable. We note the evidence on dangerous condition was conflicting, and decline the opportunity to award Martinez the equivalent of summary judgment on appeal.

A further comment on the toxic Nazi reference is required. It is true that Martinez's counsel felt the need to respond to the Nazi reference in his closing argument. But he was put in that position by Bilotti, who had imposed on Martinez's counsel a Hobson's choice: Ignore the reference and risk letting the jury base its decision on Martinez's bad character, or confront the reference and risk further association with Nazis. So it was, for Martinez, a lose-lose. There is an old saw in politics that if you have to explain it, the damage has already been done. Martinez's counsel cannot be faulted, under the circumstances, for trying to minimize the damage. But then, precisely because Martinez's counsel tried to defuse the Nazi reference, Bilotti seized the opportunity to double down on it. Instead of just saying something on the order of, "sorry about my description of the helmet, that was a low blow, please dismiss it from your minds, I got carried away," she managed to use the word "Nazi" about Martinez six times in about two breaths.

We are mindful of *Sabella's* admonition that a client should not pay for its counsel's sins: "Intemperate and unprofessional conduct by counsel as is here involved runs a grave and unjustifiable risk of sacrificing an otherwise sound case for recovery [or a defense verdict], and as such is a disservice to a litigant." (*Sabella, supra*, 70 Cal.2d at p. 321.) Ultimately, though, in this case it is the overwhelming cumulative effect of the misconduct that requires reversal, a cumulative effect considerably greater than that in *Gackstetter*, particularly given its focus on reasons Martinez *the person* should not recover. A jury prejudiced against a litigant and determined to find against that litigant is not one whose judgment can be trusted. While we recognize that the trial judge's denial of the new trial motions must be accorded deference, this judge appears to have been ready to excuse the disrespect represented by counsel's ignoring his rulings. On his

13

behalf, we are not. The misconduct forces us to reverse because it was unquestionably prejudicial. (See *Du Jardin, supra*, 38 Cal.App.4th at p. 181.)[9]

## IV. DISPOSITION

The judgment is reversed, and the matter remanded for further proceedings not inconsistent with this opinion. Martinez shall recover his costs on appeal. Pursuant to section 6086.7 of the Business and Professions Code, the clerk of this court is hereby instructed to send a copy of this opinion to the State Bar, notifying it the reversal of the judgment is based solely on prejudicial attorney misconduct. The mailing of this opinion to counsel and its disposition will also constitute notification to Attorney Bilotti the matter is being referred to the State Bar.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

---

[9]     Our reversal renders moot Martinez's argument concerning a Code of Civil Procedure section 998 offer.

14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DONN MARTINEZ et al., | |
| Plaintiffs and Appellants, | G048375 (Consol. with G048678) |
| v. | (Super. Ct. No. 30-2011-00483327) |
| STATE OF CALIFORNIA, DEPARTMENT OF TRANSPORTATION, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Respondent. | |

   The court has received multiple requests for publication of our opinion in this matter, filed June 12, 2015. After reviewing these requests, we have concluded the opinion indeed merits the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(2), (4) and (6), the requests are GRANTED.

   The opinion is ordered published in the Official Reports.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.