Filed 12/27/22  Shah v. Fidelity National Title Insurance Co. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JAY C. SHAH,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY,<br><br>        Defendant and Respondent. | A165816<br><br>(Santa Clara County<br> Super. Ct. No. 2011-1-CV- 203571)<br><br>ORDER MODIFYING OPINION, DENYING REHEARING, AND DENYING REQUESTS FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 30, 2022, be modified as follows:

1.  On page 3, second full paragraph, delete the sentence that begins "After the 2002 grant deed," and replace it with the following sentence:

> After the 2002 grant deed, several additional deeds were recorded among Shah, his parents, and their respective trusts between the years 2005 and 2010.

Existing footnote 3 remains after this revised sentence.

Appellant's petition for rehearing is denied.

Respondent's and California Land Title Association's requests for publication, filed on December 20, 2022, are denied.

There is no change in the judgment.

Dated:

_____
Humes, P.J.

2

Filed 11/30/22 Shah v. Fidelity National Title Insurance Co. CA1/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAY C. SHAH,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY,<br><br>      Defendant and Respondent. | A165816<br><br>(Santa Clara County Super. Ct. No. 2011-1-CV-203571) |

Plaintiff Jay Shah appeals from a judgment entered in favor of Fidelity National Title Insurance Company after the trial court granted summary judgment. Shah contends Fidelity failed to meet its burden to demonstrate that coverage terminated under his title insurance policy based on his voluntary conveyance of the subject property. He argues triable issues of fact exist as to continuation of coverage because a grant deed given to his parents as trustees of their trust was an equitable mortgage, not a conveyance, and because he maintained an estate or interest in the property by his continued possession of the property. Finding no merit to Shah's contentions, we affirm.

# I.  BACKGROUND

## A.  *Facts*[1]

### 1.  *Property Purchase and Title Insurance*

In 1959, non-party Mary Silva acquired a life estate in the property that is the subject of this action near Quimby Road in San Jose (the property).  In December 1995, Shah entered a contract to purchase the property from Silva for $350,000.  Silva transferred her interest in the property via a grant deed to "Jay C. Shah, Living Trust Dated June 8, 1993,"[2] (the Trust) as grantee.  When he purchased the property, Shah did not know that Silva held only a life estate.

Fidelity issued the title insurance policy in connection with Shah's 1995 purchase.  The title policy was a California Land Title Association Standard Policy—1990 Form (CLTA 1990 Form) effective December 29, 1995.  Schedule A of the title policy listed the named insured as the Trust.  The title policy stated that the "estate or interest in the land described herein and which is covered by this policy is: A Fee."

As relevant to the issues on appeal, section 2(b) of the Conditions and Stipulations, entitled, "After Conveyance of Title by an Insured," states in relevant part:  "The coverage of this policy shall continue in force as of [December 29, 1995] in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so

---

[1] This is the second appeal in this matter.  We recite only those facts relevant to the issues in this appeal.

[2] Many of the title descriptions used in this case are listed in all capital letters.  While we retain the exact text of the titles, for stylistic reasons we change the capitalization of the descriptions.

long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest."

### 2. *Subsequent Deeds*

Silva died on May 4, 2002. Upon her death, title to the property passed by operation of law to her heirs (the Silva heirs). The Silva heirs, however, did not take possession of the property and Shah remained in possession. On June 19, 2002, Shah, as trustee of the Trust, recorded a grant deed (2002 grant deed) in favor of his parents, "Chandrakant K. Shah and Mrudula C. Shah, as Trustees of the Shah 1978 Revocable Trust, dated January 22, 1978" (Parent Trust). In his first amended complaint (FAC), Shah alleges the 2002 grant deed was "made upon the mutual promises of the parties that the parents would grant title back to Shah upon certain conditions according to their oral agreement. This deed represented a mortgage rather than a sale or gift. [Civ. Code, § 2924(a).]"

After the 2002 grant deed, there were nine additional recorded transfers of the property among Shah, his parents, and their respective trusts between the years 2005 and 2010.[3]

### 3. *Foreclosure, Refinance, and Discovery of Silva's Life Estate*

In September 2007, Shah borrowed $350,000 against the property from a private lender, Conquest, using a deed of trust as a security instrument. Nine months later when the promissory note came due and Shah was unable to pay the loan balance, Conquest recorded a notice of default and set the trustee's sale for February 2009.

---

[3] Because they are not relevant to the resolution of this appeal, we do not detail the transactions here, though they are described generally in the prior nonpublished opinion. (*Shah v. Fidelity National Title Ins. Co.* (Sept. 19, 2016, H038521) [nonpub. opn.] (*Shah I*).)

3

Shah attempted to arrange a refinance transaction to avoid foreclosure. In January 2009, however, the escrow title holder company discovered Silva's life estate while searching the public record, and alerted Shah. This was the first time Shah learned of the defect in title to the property. Because Silva had only a life estate in the property, she had transferred a life estate, measured by her life (a life estate *per autre vie*), to Shah in 1995. When she died in May 2002, title to the property transferred to her heirs by operation of law, and Shah lost his interest in the property. Old Republic disclosed the title defect in its preliminary report, told Shah and his loan broker about the problem, and refused to issue title insurance to the proposed new lender. The refinancing transaction was put on hold.

Conquest held a trustee's sale on February 3, 2009, and the property was sold to Bob and Judy Schwartz (the Schwartzes).

### 4. *Shah's Quiet Title Action*

In March 2009, Shah filed suit against Silva's heirs, the Schwartzes, and Conquest to quiet title (the quiet title action). Plaintiff alleged adverse possession against the Silva heirs based on open, notorious, continuous, and hostile occupancy under color of title from 2002 forward.

On the same day he filed his quiet title action, Shah tendered a claim to Fidelity, demanding coverage under the title policy to pay coverage benefits, "including without limitation attorney fees and costs incurred . . . to date and in the future in handling [the quiet title action]." Six months later, Fidelity denied Shah's claim.

In its letter denying coverage, Fidelity pointed to the condition found in section 2(b) of the "Conditions and Stipulations" of the title policy regarding continuation of coverage. Fidelity told Shah that the 2002 grant deed to his parents as trustees of the Parent Trust terminated the title

4

insurance policy and cancelled coverage because it was a "voluntary alienation of the property." Fidelity wrote that because Shah was "no longer the owner of an estate or interest" in the property, Fidelity had no contractual obligation under the title policy.

Plaintiff eventually settled his lawsuit against the Silva heirs, Conquest, and the Schwartzes, and in March 2010, the quiet title action was dismissed. Shah incurred $135,000 of attorney fees, costs of suit, and expenses in connection with the quiet title action.

### 5. *Shah's Continuous Occupancy of the Property*

From December 1995 when Shah acquired his interest in the property from Silva through March 2010 when he settled his quiet title action, a period of more than 14 years, Shah was the only constant occupant of the property. Shah claimed he "actually possessed and controlled the land" and believed he was the "absolute and rightful sole legal owner of it." Shah used the property, maintained dirt roads and fixtures on it, repaired fences and gates on it, rode his horses on it, and entered an agricultural lease to allow a rancher to run livestock on his land, for which he collected rents for many years. Shah did not surrender possession of the property to his parents in connection with any of the deeds signed by him and he paid mortgage installments owed to Silva and her estate after her death.

## B. *Procedure*

In June 2011, Shah commenced this action against Fidelity for damages. The operative FAC alleged two causes of action for breach of contract (title policy) and breach of the implied covenant of good faith and fair dealing. The trial court sustained Fidelity's demurrer without leave to amend. Shah appealed that decision and the Sixth District reversed in *Shah I.*

5

On remand, the trial court overruled the demurrer. After the parties engaged in discovery, Fidelity filed a motion for summary judgment. Shah opposed the motion for summary judgment, and filed his own motion for summary adjudication.

The trial court granted Fidelity's motion for summary judgment and determined Shah's motion for summary adjudication was moot. The court concluded that Fidelity met its burden to show coverage terminated under section 2(b) of the title policy before Shah's 2009 tender because Shah had voluntarily transferred the property to his parents in 2002, and the transfer became effective by operation of law in May 2007 when Shah obtained fee title through adverse possession, under the after acquired title doctrine (Civ. Code, § 1106). The trial court concluded Shah had failed to raise a triable issue of material fact in opposition to the summary judgment motion.

The trial court also granted Fidelity's motion for summary adjudication on the cause of action for breach of the implied covenant of good faith and fair dealing, and the claim for punitive damages under the genuine dispute doctrine because there was no triable issue as to whether Fidelity's denial of the claim was unreasonable or without proper cause.

The court entered judgment in Fidelity's favor. Shah timely appealed to the Sixth District Court of Appeal. The appeal was subsequently transferred to this District for resolution.

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "A defendant moving for summary judgment has the initial burden of showing, with respect to each cause of

6

action set forth in the complaint, the cause of action is without merit.  A defendant meets that burden by showing one or more elements of the cause of action cannot be established, or there is a complete defense thereto. [Citation.]  If the defendant makes such a showing, the burden shifts to the plaintiff to produce evidence demonstrating the existence of a triable issue of material fact." (*Leyva v. Garcia* (2018) 20 Cal.App.5th 1095, 1101, citing *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)  If the plaintiff fails to meet that burden, the motion will be granted.  (*Leyva,* at p. 1102.)

"In determining whether a summary judgment motion was properly granted, 'we review the trial court's decision de novo, applying the rule that "[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail." ' [Citation.]" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 641.)  Where the trial court's ruling is based on interpretation of insurance policy language, which is a question of law, our review of that question is also de novo.  (*Ibid.*; *First American Title Ins. Co. v. XWarehouse Lending Corp.* (2009) 177 Cal.App.4th 106, 112–113.)

## B.  *Termination of Coverage*

Shah contends the trial court erred in granting summary judgment for several reasons.  First, Shah contends he could not transfer the property to his parents as trustees of the Parent Trust via the 2002 grant deed because he had only a life estate and the 2002 grant deed was a "wild deed" outside the chain of title.  Second, Shah asserts that the 2002 grant deed was a mortgage, not a conveyance, and therefore he did not transfer the property. Third, Shah asserts that he remained in possession of the property at all relevant times, thus maintaining an "estate or interest" within the meaning

7

of the continuance of coverage provision in section 2(b) of the title policy. For reasons we will explain, none of these contentions are availing.

   1. *Conveyance by After-acquired Title*

Fidelity moved for summary judgment on the ground that Shah's cause of action for breach of the title insurance policy lacked merit because coverage terminated when plaintiff voluntarily transferred the property to his parents. Fidelity asserted that coverage under the title policy ended when Shah obtained fee title by adverse possession of the property in May 2007. At that time, under the after-acquired title doctrine, his acquisition of fee title transferred the property to his parents under the June 2002 grant deed by operation of law pursuant to Civil Code section 1106.

In support of its motion, Fidelity produced the policy of title insurance and the 2002 grant deed from Shah to his parents as trustees of the Parent Trust. The title policy, a CLTA 1990 Form standard policy, defines "insured" as "the insured named in Schedule A, . . . and those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributes, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors." Schedule A of the policy lists the insured as "Jay C. Shah, Living Trust Dated June 8, 1993." Section 2(b) of the policy provides that the coverage of the policy shall continue "so long as the insured retains an estate or interest in the land."

The 2002 grant deed, recorded on June 19, 2002, states that Shah, as trustee of the Trust, "hereby grant(s)" the property to his parents as trustees

8

of the Parent Trust "for a valuable consideration, receipt of which is hereby acknowledged."[4]

Relying on this evidence and *Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562 (*Kwok*), Fidelity argued that Shah voluntarily transferred the interest he had in the property to his parents. In *Kwok*, a husband and wife formed a limited liability company (LLC) and were its only members. (*Id.* at p. 1565.) The LLC purchased real property and obtained a CTLA standard form title insurance policy naming the LLC as insured. (*Ibid.*) The LLC later transferred the property via grant deed to the Kwoks as trustees of their revocable family trust and dissolved the LLC. When the Kwoks sought coverage from the title insurance company in an easement dispute with their neighbors, the company denied their claim on the ground that the LLC's voluntary transfer of the property to the Kwoks as trustees terminated coverage under the policy. (*Id.* at p. 1566.) The trial court rejected the Kwoks' claim that they became insureds by operation of law when they succeeded to the LLC's interest, and the appellate court affirmed. (*Id.* at pp. 1567, 1573.) As the court explained, "[t]he transfer of property by an insured into a family trust is a voluntary act and not one that arises by operation of law." (*Id.* at p. 1571.) Because the LLC as the named insured had transferred the property's title to the nonmember trustees, coverage under the title insurance policy terminated as a matter of law. (*Ibid.*) Similarly, here, Fidelity offered evidence that Shah voluntarily transferred what appeared to be fee title to his parents as trustees of the Parent Trust by way of the 2002 grant deed.

---

[4] The trial court took judicial notice of the 2002 grand deed at Shah's request.

9

As both parties recognize, however, Shah was not able to transfer fee title to his parents in June 2002 because at that time his life estate *per autre vie* had terminated.  In support of its summary judgment motion, Fidelity argued that Shah obtained fee title to the property on May 4, 2007 by adverse possession, at which time fee title passed by operation of law to his parents under the after-acquired title doctrine.  At *that point*, the voluntary conveyance via the 2002 grant deed became effective by operation of law and terminated his title coverage under section 2(b) of the title insurance policy.[5]

"Where a person purports by proper instrument to grant real property in fee simple, and subsequently acquires any title, or claim of title thereto, the same passes *by operation of law* to the grantee, or his successors."  (Civ. Code, § 1106, italics added.)  "It has long been recognized . . . that if a grantor purports to convey an interest in land which the grantor does not own, but afterwards acquires, the interest passes to the grantee at the time the grantor obtains it.  'The general rule is that if the grantor in a conveyance of real property has no title, a defective title, or an estate less than which he assumed to grant, but subsequently he acquires the title or estate he purported to convey or perfects his title, the after-acquired or perfected title will inure to the grantee or his successors by way of estoppel, *i.e.*, the grantor is estopped to deny the after-acquired title passed by his conveyance.' "

_____

[5] We observe that Shah's title insurance coverage would not have ended simply because his life estate *per autre vie* terminated and he no longer held title to the property when Silva died.  Such an interpretation would only serve to invalidate the most serious of title claims—those involving a total loss of title—and defeat the purpose of title insurance.  (Ins. Code, § 12340.1 [title insurance insures policy holders against loss or damage arising from defects in title to said property]; *Quelimane Co., Inc. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 41 [title insurance "insures against losses resulting from differences between the actual title and the record title as of the date title is insured"].)

(*Noronha v. Stewart* (1988) 199 Cal.App.3d 485, 489.) "The net effect 'is the same as if the grantor specifically provided in the deed that it conveyed all of the title and estate that the grantor then possessed or might at any time thereafter acquire.' " (3 Miller & Starr, Cal. Real Estate (4th ed. 2022) After-acquired Title, § 8:74, p. 8-250; see *Noronha*, at p. 489.)

Fidelity presented evidence that Shah acquired title to the property by adverse possession on May 4, 2007. In support of this assertion, Fidelity offered Shah's verified complaint in the quiet title action, in which plaintiff alleged he met all of the elements required for adverse possession and obtained title to the property. Specifically, plaintiff stated under penalty of perjury that "[f]or the requisite 5-year period plaintiff actually, notoriously, exclusively, and openly possessed the real property under claim of right and color of law. An inspection of the real property would convey notice of plaintiff's possession and use of the real property and would make it obvious that plaintiff was at all relevant times the true owner. In addition, plaintiff has paid all real property taxes assessed on the real property during the adverse possession period. Due to the foregoing, plaintiff has obtained title to the real property by adverse possession." Fidelity also relied on allegations in Shah's FAC, discovery responses, and deposition testimony that Shah remained in exclusive possession and control of the property from December 29, 1995 through March 2, 2010, without limitation, that his possession was hostile to the Silva heirs (the true owners), and that, among other things, he controlled and limited access to the property, leased the land to a cattle rancher, and used the property himself. (See, e.g., *Dimmick v. Dimmick* (1962) 58 Cal.2d 417, 421 [elements of adverse possession are (1) actual possession with reasonable notice to owner, (2) hostile to owner's title,

11

(3) under claim of right or color of title, (4) for five years uninterrupted, and (5) payment of property taxes].)

This evidence produced by Fidelity sufficed to meet its initial burden to show that coverage under the policy terminated under the after-acquired title doctrine when Shah obtained fee title by adverse possession in May 2007 and the property transferred by operation of law under the 2002 grant deed.[6] At that point, it was incumbent on Shaw to demonstrate one or more triable issues of material fact as to continuation of coverage.

In opposing summary judgment, Shah did not directly address the after acquired title doctrine. On appeal, he contends it is *not* undisputed that he obtained title by adverse possession in 2007. Rather, he argues Fidelity cannot rely on his allegations in the quiet title action because no final judgment was entered in that case. Shah asserts his mere allegations in the quiet title action cannot be accepted as proof of his acquisition of title by adverse possession under Code of Civil Procedure section 764.010.

We disagree. First, Shah's citation to Code of Civil Procedure section 764.010[7] is unavailing because it states the requirements for

---

[6] We emphasize that Shah's title insurance coverage did not terminate at the time he recorded the 2002 grant deed. We agree with Shah that because his life estate *per autre vie* terminated when Silva died in May 2002, he had no valid title, and thus, the deed was not effective to convey any interest in the property at that point in time. However, when he obtained fee title by adverse possession in May 2007, the 2002 conveyance became effective automatically by operation of law under the after-acquired title doctrine. Thus, his title insurance coverage terminated in May 2007.

[7] Code of Civil Procedure section 764.010 provides: "The court shall examine into and determine the plaintiff's title against the claims of all the defendants. The court shall not enter judgment by default but shall in all cases require evidence of plaintiff's title and hear such evidence as may be offered respecting the claims of any of the defendants, other than claims the

12

obtaining a quiet title judgment, but a judgment is not required for *acquisition* of fee title by adverse possession.[8] "Fee simple title vests in the adverse possessor by operation of law at the moment the requisite conditions for adverse possession have been established for the statutory period. [Citation.] The adverse possessor is not required to take any further steps to acquire title once those conditions have been met." (*Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191; see *People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1166 ["Under the law of adverse possession, the possessor need not bring an action to perfect his or her claim of title."]; Civ. Code, § 1007 [occupancy for statutory period confers a title by prescription].) Shah attempts to distinguish *Keener* by noting the court in that case only held the plaintiff's lawsuit was not barred by laches at the demurrer stage, but he fails to address the legal principle that an adverse possessor is not required to file a lawsuit or obtain a judgment for fee title to vest by operation of law.

Second, it is well established that allegations from a prior pleading can be used as evidence to meet a moving party's burden to demonstrate the absence of a triable issue of material fact. (*Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1061 [a pleading in a prior civil proceeding may be offered as an evidentiary admission against the pleader, even on behalf of a stranger to the prior action]; *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1425, fn. 21 (*Mt. Hawley*) [same].)

---

validity of which is admitted by the plaintiff in the complaint. The court shall render judgment in accordance with the evidence and the law."

[8] Indeed, a plaintiff may not *initiate* a quiet title action until he or she has acquired prescriptive title. (Civ. Code, § 1006.)

13

Here, Shah did not present any evidence to contradict his prior claim he acquired fee title in May 2007.  (See, e.g., *Mt. Hawley, supra,* 215 Cal.App.4th at p. 1425, fn. 21 [admission from prior pleading may be rebutted with explanatory evidence from the party against whom the admission is offered].)  Rather, Shah admitted in his opposition memorandum of points and authorities in the trial court—and again in his opening brief on appeal—that he continuously possessed and controlled the land under color of title as required for adverse possession.  Further, the evidence he presented in opposition to summary judgment—that he was the sole occupant of the property from 1995 through March 2, 2010, that he, "without exception," exclusively possessed and controlled the land and "believed [himself] to the be absolute and rightful sole legal owner of it," that he maintained the property and excluded others, and that he leased the land to a rancher, serves only to support the claim he acquired fee title by adverse possession.[9]  Because Shah failed to present any evidence to controvert his claim he obtained fee title in May 2007, he failed to demonstrate the existence of a triable issue of fact on that point.[10]

---

[9] In his opening brief on appeal, Shah further states that after Silva died, "Shah occupied the 106 acres thereafter for almost seven years unaware of a defect in the title under *color* of title arising from the recorded deed from Silva . . . . [¶] Shah occupied the land *hostile* to the true owner.  This is known as *adverse* possession because it is *against* the rights of the real owners.  He also exercised his perceived, unchallenged right to rent out the land *against* the exclusive rights held by the real owner to do so.  He controlled the land, he maintained it, and kept others away who had no business there."

[10] We likewise reject Shah's argument that coverage did not terminate under the after-acquired title doctrine with the 2002 grant deed because his parents thereafter transferred title back to him and thus he succeeded his parents in obtaining fee title to the property.  The case Shah cites, *Noronha*

14

## 2. *Equitable Mortgage*

Shah next argues that the 2002 grant deed was not a grant deed, despite its outward appearance as one, because he and his parents understood it was a mortgage, not a conveyance of fee title.

Fidelity met its initial burden to show the 2002 grant deed transferred Shah's after-acquired fee title by operation of law. The 2002 grant deed states simply that Shah, as trustee of the Trust, "hereby grants" the property to his parents as trustees of the Parent Trust. This operative language is typical of a fee simple grant deed. (Civ. Code, § 1105 ["A fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended."].) In *Schwen v. Kaye* (1984) 155 Cal.App.3d 949, 952, for example, the plaintiff was estopped to deny she voluntarily transferred title under the after-acquired title doctrine based on a grant deed delivered into escrow using similar language as the 2002 grant deed in this case. As the court in *Schwen* explained, "No reservation of rights or other limiting language appeared in the deed. A fee simple title is presumed to pass by a grant of real property, unless it appears *from the grant* that a lesser estate was intended. (Civ. Code, § 1105; italics added.) Grant deeds are to be interpreted like contracts (Civ. Code, § 1066.) The essential element of a grant deed which unquestionably transfers an after-acquired title is the word " 'grant.' "[11] (*Schwen*, at p. 952; see *Klamath*

_____

*v. Stewart*, *supra*, 199 Cal.App.3d at page 489, does not discuss such a rule. In any event, the question under section 2(b) of the title policy is whether Shah voluntarily conveyed his interest so as to terminate coverage, not who ended up with title after multiple voluntary conveyances.

[11] We reject Shah's argument that Fidelity failed to meet its initial burden to prove the nonexistence of a material fact because Shah pled the instrument was in fact a mortgage and Fidelity failed to address that

15

*Land & Cattle Co. v. Roemer* (1970) 12 Cal.App.3d 613, 618 ["A grant deed unquestionably transfers an after-acquired title."].)

Once Fidelity met its initial burden, the burden shifted to Shah to show the existence of a triable issue of fact. Shah argues that the 2002 grant deed did not convey a fee simple estate to his parents, but was a "mortgage" in the unconventional form of a deed absolute. In support of the assertion, Shah points to his own declaration and declarations by his parents, purporting to confirm that his parents loaned him money and the grant deed was merely security for the loan.

Shah's evidence failed to raise a triable issue of material fact. It is presumed that a deed absolute on its face conveys fee title to a grantee, but the presumption is rebuttable. (Civ. Code, § 1105; Evid. Code, § 662.) A party contending that a grant deed is in fact only a mortgage has the burden of proof to establish the fact by clear and convincing evidence. (Evid. Code, § 662; *Beeler v. American Trust Co.* (1944) 24 Cal.2d 1, 7 (*Beeler*).) When a fact must be proven at trial by clear and convincing evidence, a plaintiff opposing summary judgment must produce evidence that could, if accepted by a rational trier of fact, satisfy that standard of proof. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252; *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1118–1121.)

---

allegations in its motion. Fidelity's presentation of the recorded grant deed and legal argument that such transfers are presumed valid sufficed to meet its initial burden to show a voluntary conveyance and shifted the burden to Shah to demonstrate the existence of a triable issue of material fact as to whether the 2002 grant deed was in fact a mortgage despite its appearance as an absolute deed. (See Civ. Code, § 1105; Evid. Code, § 662 ["The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."]; *Wehle v. Price* (1927) 202 Cal. 394, 396–397.)

Here, the only evidence regarding the mutual intention of the parties to treat the deed as a mortgage comes from Shah, who stated in his declaration: "From my recollection I and my parents verbally agreed that this deed (and the two others mentioned below to my parents) were subject to being reversed on certain conditions of my performance and thus given only as security. [¶] I treated this and other deeds mentioned below as a mortgage to secure debts owed to my parents." Shah's parents, however, do not attest to such an arrangement. Although the declaration of Shah's parents states, among other things, that they did not pay money to Shah to purchase the property, there was no escrow or title insurance issued in connection with the deed, and they did not take (or intend to take) possession of the property, nowhere do they state that the 2002 grant deed was a mortgage or that they understood it to be one.

The vague statement appearing *only in Shah's declaration* as to a verbal agreement with his parents that the deed was subject to being reversed on certain conditions of his performance and his own treatment of the deed as a mortgage "falls far short of those requirements necessary to justify the overthrow of a deed absolute on its face, for the presumption is that such a deed is what it purports to be, and the burden of proof is upon the party claiming that it is only a mortgage. It must appear to the court beyond all reasonable controversy that it was the intention of not only one but all of the parties that the deed should be a mortgage. 'A mere secret intention on the part of one of the parties, not disclosed or communicated to the other, will not have the effect of changing the character of the transaction.' " (*Wehle v. Price, supra*, 202 Cal. at pp. 396–397; *Develop-Amatic Engineering v. Republic Mortgage Co.* (1970) 12 Cal.App.3d 143, 148 [unilateral and

17

undisclosed intent of plaintiff to treat transaction as a mortgage could not be used to belie the apparent status of the conveyance].)

Moreover, for an absolute deed to be construed as a mortgage, there must be a relationship of debtor and creditor between the parties. (*Beeler, supra,* 24 Cal.2d at p. 20; *Shusett, Inc. v. Home Sav. & Loan Assn.* (1964) 231 Cal.App.2d 146, 152 [in asserting absolute deed is mortgage, plaintiff must allege creation of a debt or other obligation and that both parties intended the deed be a mortgage to secure such debt or obligation].) But here the only specific evidence in the record that Shah borrowed money from parents shows that he asked to borrow money from them in December 2002, over six months *after* the 2002 grant deed was recorded. Both Shah's declaration and the declaration from his parents indicate that Shah asked his parents in December 2002 for almost $300,000 to pay off the balance of the promissory note to Silva, which amount they gave him the same month. Shah's parents attested that "Before that payoff of that debt, we did not at any time pay any of the monthly installment payments due on that debt. Our payment on that obligation owed by our son Jay was limited to that one-time payoff to the Silva Estate." Shah's vague statement in his own declaration that *he* "treated [the 2002 grant deed] . . . as a mortgage to secure debts owed to [his] parents" is insufficient to raise a triable issue that both Shah and his parents intended the 2002 grant deed as a mortgage when the only evidence in the record of a debt owed to his parents was the almost $300,000 Shah borrowed from them more than six months *after* the 2002 grant deed was recorded and no one attests the previously recorded 2002 grant deed secured *that* debt.

18

### 3. *Possession As an "Estate or Interest"*

Shah also contends that he retained "an estate or interest" within the meaning of the continuation of coverage policy term because it is undisputed he retained a possessory interest in the property at all relevant times. Relying on the definition of a "possessory estate" in Black's dictionary, Shah argues Fidelity was obligated to continue his coverage because he retained such an interest in the property. Shah also argues that he had a legitimate "interest" in the land because he had a right to receive income from his agricultural lease for cattle grazing made with a rancher.

The express terms of the policy, however, dictate otherwise. " 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " [Citation.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. [Citations.]" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321.) When construing an insurance contract, as with any other contract, we consider the whole of the contract together. (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].) We will not find contracts "to be ambiguous in the abstract" or "strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19.)

Section 2(b) of the title policy states that coverage continues in favor of an insured "only so long as the Insured retains an estate or interest in the

19

land . . . ." When construing the policy as a whole, this language is not ambiguous. Among other things, the policy insured "against loss or damage . . . sustained or incurred by the insured by reason of: [¶] 1. Title to the estate or interest described in Schedule A being vested other than as stated therein." Schedule A of the policy uses the same language to state: "The estate or interest in the land described herein and which is covered by this policy is: A Fee." Thus, the express language of the policy indicates the coverage provided is *title* protection, not occupancy or a right to collect rents or profits. This language is consistent with the purpose of title insurance. (See *Siegel v. Fidelity Nat. Title Ins. Co.,* (1996) 46 Cal.App.4th 1181, 1191 [" 'A title policy is ". . . a contract to indemnify against loss caused by defects in the title or encumbrances on the title" ' "].)

"We are not at liberty to rewrite the policy to achieve the result [Shah] seek[s]. ' "[W]e do not rewrite any provision of any contract, [including an insurance policy], for any purpose." ' " (*Kwok, supra,* 170 Cal.App.4th at p. 1571.) Under the express terms of the policy, coverage terminated when Shah voluntarily conveyed the property and thereafter acquired fee title by operation of law. (See *Londen Land Co., LLC v. Title Resources Guar. Co.* (9th Cir. 2012) 467 Fed. Appx. 708, 709–710 [insured did not "retain an estate or interest in the land" within meaning of continuation of coverage provision when it conveyed land to LLC in fee simple because it "conveyed the entirety of its estate or interest"].) Accordingly, Shah cannot demonstrate the existence of a triable issue of fact regarding continuation of coverage based on his possession and occupancy of the property or his collection of rents.

For all of the reasons we have discussed, Fidelity met its initial burden to demonstrate coverage under the title insurance policy terminated under

section 2(b) when Shah voluntarily transferred the property to his parents in the 2002 grant deed and subsequently acquired fee title by adverse possession in May 2007. Because Shah failed to present evidence raising a triable issue of material fact, Fidelity was entitled to judgment as a matter of law on Shah's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Accordingly, we do not reach the parties' arguments as to other possible grounds for summary judgment.

C. *Request for Judicial Notice*

Fidelity requested we take judicial notice of the docket in *Shah v. Schwartz* (Super. Ct. Santa Clara County, No. 1-09-CV-136321), to support its argument that Fidelity owed no duty to defend Shah in that case because no party asserted a cause of action against him based on a matter insured against under the policy or challenged his title to the subject property. We deny the request as it is unnecessary to resolution of this appeal.

D. *Civility*

In concluding, we are obligated to admonish Shah's counsel, Craig J. Bassett, for making repeated, unfounded personal attacks on the trial court and opposing counsel in his appellate papers, apparently because he disagreed with the trial court's decision. To illustrate, we will quote a few excerpts from the opening and reply briefs.

About the court: "Thus far, the trial court has favored Fidelity because that court does not understand, and refuses to learn, the principles of the law applicable to the facts of this case. The lower court unlawfully sides with the *wrongdoer* and throws Shah out the courtroom door, *twice* now!" "The lower court wrests [the] holding [of *Marriage v. Keener, supra*, 26 Cal.App.4th 186], misrepresents it, and misuses it to *knowingly* err to achieve a preconceived outcome harmful to Shah. It wanted to vindicate the judge of the same court

21

who in error prejudicially sustained Fidelity's demurrer to Shah's FAC on the same erroneous grounds, despite the successful appeal and reversal of that decision." "In rendering its decision on the MSJ [(motion for summary judgment)], the lower court acted like a magical mystery trial had been held without a jury while Shah was *in absentia* and that it was decided based on one single document alone . . . ."

"The duplicity of the lower court, however, exposes its pervasive error." "The lower court's short-sighted derogation of the policy of the law explained above and its total disregard for the relevant statutes in order to achieve a wrongful outcome to favor the title insurance industry and knowingly harm the innocent insured, *twice now*, means that something is terribly wrong and that the courts have lost their way." "The lower court knowingly erred here to protect *itself* rather than enforce the law as was its sworn duty." The trial court "refuses to get the facts straight, refuses to interpret the clause properly, and refuses to follow the law."

About defendant, and by implication, opposing counsel: "Because it knows that it can with success, as this case proves, engage in bad faith insurance tactics to seduce gullible courts who have little experience and no training in such matters . . . ."[12] "Is it not the goal here to consider and discover the truth, the *whole* truth, and *nothing but* the truth drawing inferences from and accepting evidence in the light most favorable to Shah? Why would Fidelity think itself above this law? Because it believes it is a law unto itself not subject to the law so that it can in bad faith seek exoneration on spurious grounds when its liability is clear. The sophistry of Fidelity cannot be passed off as truth in this proceeding." "This court should respect

---

[12] We note this comment is also (obviously) another insult directed at the trial court.

22

and adopt [Shah's] absolutely correct analysis, no matter what bag of tricks, lies, and misdirection Fidelity throws at the Court at this juncture, which is all that  Fidelity has done judging by the content of its respondent's brief."

These quotes are a sampling of the numerous inappropriate arguments scattered throughout counsel's briefs.  Perhaps not surprisingly, these unhelpful remarks are unsupported by any evidence in the record.  Such bombastic, ad hominem attacks have no place in an appellate brief and are potentially contemptuous and sanctionable behavior.  "[A]n opening brief is not an appropriate vehicle for an attorney to 'vent his spleen' . . . . This is because, once the brief is filed, both the opponent and the state must expend resources in defending against and processing the appeal.  Thus, an unsupported appellate tirade is more than just words on paper; it represents a real cost to the opposing party and to the state." (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 32–33, fn. omitted [awarding sanctions for frivolous arguments unsupported by the record made in an opening appellate brief].)

Further, "[d]isparaging the trial judge is a tactic that is not taken lightly by a reviewing court.  Counsel better make sure he or she has the facts right before venturing into such dangerous territory because it is contemptuous for an attorney to make the unsupported assertion that the judge was 'act[ing] out of bias toward a party.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 422.)  We note counsel's unwarranted attacks are particularly hypocritical in that counsel makes reference multiple times to overburdened and busy courts.  Ironically, the extremely argumentative nature of his two briefs on appeal makes it more time-consuming for this court to sift through the unjustified personal attacks and hyperbolic rhetoric to get to the legal issues that need to be resolved.

Counsel's attacks also reflect poorly on the profession. Impugning the character of opposing counsel is almost never appropriate, and in this case as we have noted, the charges were particularly unfounded, given the level of hypocrisy counsel demonstrated in making them. (See, e.g., *In re S.C.*, *supra*, 138 Cal.App.4th at p. 412 ["unwarranted personal attacks on the character or motives of the opposing party, counsel, or witnesses are inappropriate and may constitute misconduct"]; *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 ["Attorneys are not to mount a personal attack on the opposing party even by insinuation."].)

It would be deeply disturbing if the lack of professionalism and respect reflected in counsel's conduct toward the court and opposing counsel were common among members of the bar. Based on our experience, it is not. For counsel's benefit, however, we repeat the admonition of the Board of Governors of the State Bar that "attorneys have an obligation to be professional with . . . other parties and counsel, [and] the courts . . . . This obligation includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution." (Cal. Atty. Guidelines of Civility & Professionalism (July 20, 2007) Introduction., p. 3; *id.*, § 4, p. 5 ["An attorney should not disparage the intelligence, integrity, ethics, morals or behavior of the court or other counsel, parties or participants when those characteristics are not at issue. [¶] . . . [¶] . . . An attorney should avoid hostile, demeaning or humiliating words."].) The kind of conduct displayed in counsel's appellate briefing "not only disserves the individual involved, it demeans the profession as a whole and our system of justice." (*Id.,* Introduction, p. 3.) Rather, counsel must "strive for the highest standards of attorney behavior to elevate and enhance our service to justice." (*Ibid.*)

24

We strongly admonish plaintiff's counsel to conduct himself in a more professional manner when appearing before this or any other court, and note that such conduct in a future case may subject him to sanctions much harsher than this warning.

## III.  DISPOSITION

The judgment is affirmed.  Fidelity shall recover its costs on appeal.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A165816
*Shah v. Fidelity National Title Insurance Company*