Filed 6/18/26  Baca v. Baha CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JAMIE NICOLE BACA, | B333334 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC069048) |
| v. | |
| MUSTAPHA BAHA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank M. Tavelman, Judge.  Affirmed.

Jamie Nicole Baca, in pro. per., for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, John J. Manier, and Jessica A. Gomez for Defendant and Respondent.

————————————

Jamie Nicole Baca, whose legal name is now Jamie Nicole Heitmeyer, appeals after the jury found in Mustapha Baha's favor on Heitmeyer's causes of action for sexual battery and intentional infliction of emotional distress.  Heitmeyer argues the judgment must be reversed because the verdicts were not supported by substantial evidence, the trial court erred in not excluding photographs showing her socializing and looking happy after the alleged sexual battery, and defense counsel engaged in prejudicial misconduct at trial.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Evidence at Trial*

1. *Heitmeyer meets Baha through an investment pitch*

Baha is a business investor and board member of Pasadena Angels, a group that seeks early investments in promising businesses.  He first saw Heitmeyer in July 2016 when she made a short virtual "pitch" to Pasadena Angels for investment in her start-up cosmetics company.  Pasadena Angels chose not to select Heitmeyer to make an in-person pitch but invited her to a breakfast in August 2016 to watch other presentations and meet with potential investors.  Baha first met Heitmeyer at this breakfast.  Another board member, Kristin Hiibner, was Pasadena Angels' "lead" contact with Heitmeyer and served as an advisor and mentor.

A few weeks after the breakfast, Baha's wife of more than 30 years was killed in a car accident.  Baha and his daughter were injured in the accident.

In November 2016, Baha, Hiibner, and other members of Pasadena Angels met Heitmeyer to discuss a proposed $200,000 investment in her company.  According to Baha, by late January

2

2017, he had decided against investing after seeing "a bunch of red flags." He found Heitmeyer had "really nothing to show" and none of her proposed contracts had come through. He viewed her as inexperienced and her chief financial officer as a "novice" who "ha[d] no clue what he's doing."

Meanwhile, Hiibner invested $75,000 of her own money in Heitmeyer's company. Hiibner and Heitmeyer's business relationship soon deteriorated, however. Heitmeyer threatened a lawsuit against Hiibner in October 2017. Hiibner accused Heitmeyer of "fraudulent misrepresentations" of her company's finances and "misuse of corporate funds."

More than nine months after their last contact, Heitmeyer requested to join Baha's LinkedIn network, and Baha accepted. Heitmeyer testified that Baha called her a couple days later, and she started to tell him about her conflict with Hiibner but said she would feel more comfortable talking to him on the topic in person. They agreed to meet at a coffee shop in Pasadena on November 2, 2017.

2.  *November 2 meeting at the coffee shop*

According to Heitmeyer, she and Baha met at a coffee shop for about two hours. Baha apologized for Hiibner's behavior and stated he would help her by going back to Pasadena Angels to "make this right with [her] as far as the investment was concerned." Heitmeyer understood this to mean Baha would help her get $200,000 for her company. Baha told her he would take over as her Pasadena Angels "lead" and in that capacity would meet with her once a week "and do his due diligence of getting to know the entrepreneur," i.e., Heitmeyer. He asked if Heitmeyer was okay with that, and "of course, [she] was."

3

For about 75 percent of the time at the coffee shop, Baha talked about how difficult his life had been since his wife had died, growing teary-eyed a few times. He told her it had been really hard finding adult companionship. During the meeting, except for a hug when they first greeted each other, there was no physical contact between them. At the conclusion of the meeting, they left it that she would make changes to some of her business documents and get back to him, and he would contact her to set up another meeting.

Baha testified he had been lonely since witnessing his wife's death, and he was hoping to start dating again. He was still uninterested in investing in Heitmeyer's company, particularly given its current financial state. Baha sought to convey to Heitmeyer that he was interested in her personally and interested in dating her, but not in investing in her business. He did not offer her funding for her company.

3. *November 7 meeting at a hotel and first visit to Baha's home*

On November 6, Baha texted Heitmeyer he was "[l]ooking forward to our get together tomorrow" and arranged to meet her at a hotel bar. Heitmeyer testified she understood they would be meeting for their regular weekly meeting.

The following evening, Baha and Heitmeyer met at the hotel, where Heitmeyer had a drink and they walked around the hotel garden and grounds. According to Heitmeyer, Baha "talked a lot about how excited he was ... to work with me and how it was ... a great business." He also vented about some business issues he was having. Occasionally he would touch her shoulder or leg, but she did not think too much of it because she thought maybe

4

he was just a "close talker." Baha also told her while they were at the hotel that he found her very attractive.

Heitmeyer testified that she agreed to go to Baha's house with him to let his dog out and so he could show her his home office where they would be having their other weekly meetings. As he was showing her around his house, he kissed her on the lips but Heitmeyer stopped him, saying, " 'No. This is not appropriate. I'm here for business.' " Baha "apologized profusely and said he wouldn't do it again and he was sorry and he's just never been around an attractive woman like me before." Heitmeyer told him she wanted to go back to the hotel and get back home to her family, and he said that was fine and then took her back in his car. Then she left the hotel. Heitmeyer felt "caught off guard," "disrespected," "confused," and "a little shocked" by Baha trying to kiss her. Baha said he would make it up to her and asked if they could meet again, and Heitmeyer told him she would think about it.

Baha testified that at the hotel, they talked about his life, his loneliness, and some of his interesting investments. He did not offer her funding for her company. At one point he put his arm around Heitmeyer's shoulder, they held hands, and he kissed her. At no point did she say no or indicate she did not want him to do that. About an hour later, Baha drove Heitmeyer to his nearby home and showed her around. He kissed her again before they returned to the hotel and separated. Heitmeyer did not indicate his kiss was unwelcome.

A few hours later, Baha sent Heitmeyer a text stating, "Thank you for the nice evening. Hope traffic was light and you made it home safe." At 7:16 a.m. the next morning, Heitmeyer replied, "Yes, I made it home ok :) thank you."

According to Heitmeyer, she was very angry when she received the text asking if she made it home safe.  She responded to the text because she did not want him to be uncomfortable about what had happened and she "felt sorry for him.  And [she] was trying to be professional, keep the business going."  She still wanted him to invest $200,000.

4. *November 14 meeting at Baha's home*

Baha invited Heitmeyer over to his house on November 10 for breakfast or lunch.  She was unavailable that day but accepted his invitation to come over on November 14.

a. *Heitmeyer's account*

Heitmeyer testified she went to Baha's house on November 14 for their "weekly meeting."  Baha had texted her, "Let's work together," and she responded she would bring over her investor pitch documents and financial documents.  Although Baha had tried to kiss her before, he had apologized, and she "figured he was back on track with business."

On November 14, she arrived shortly before 10:00 a.m. and stayed for an hour and a half to two hours.  She and Baha sat together in the kitchen.  She said she would have a mimosa, and he "fumbl[ed] around" making one.  Heitmeyer brought "her papers," but Baha said they could discuss them later—he wanted to get to know her first.  She told him her company was in a really bad position and she needed to get the financials straightened out.  He put his hand on her leg and told her he found her extremely attractive.  He said, "Let's go in the other room and get to know each other better."  Heitmeyer responded, "No.  You know, I'm fine at the kitchen table just going over everything."

6

Baha looked over a copy of her litigation-threatening correspondence with Hiibner and her "pitch deck" and said everything looked good with it. He also told her, " 'We can work this out, all the money will be fine. I will take care of it.' " He asked again to go in the other room and talk and get to know each other, and when she said no, he looked frustrated. He said he had to go to the bathroom and then was gone for at least 10 minutes.

When Baha returned, Heitmeyer was standing in the kitchen. He came up behind her and put his arms around her. He moved his hands up her chest area and around her neck and he was squeezing her tightly. His arm was around her front for "enough time where he like said to [her] 'I find you extremely attractive.' " His arm brushed her breasts when he put his arm around her, but he did not grope or try to grab her breasts, crotch or buttocks. Baha was "moving around a little bit," and she felt his "hard-on on the back, [her] back and butt area." Then he flipped her around to face him, and she felt his erection on her "front side," "[l]ike the vagina." He forcibly kissed her on the lips, and she said no and "pulled away."

Baha had her arms pinned down by her sides and said, " 'Come on. I told you I'd fix the money. Let's just go into the other room. You're here now. Let's make the best of it.' " He started kissing her again, and she pulled away and "yelled at his face 'no, no, no.' " "[H]e was just staring at [her]," and she "was scared." She "somehow got out or left" in her car, but she did not remember how.

After this alleged incident, Heitmeyer was "[v]ery upset and annoyed, disappointed, angry," and "extremely frustrated that … [Baha] would disrespect [her] like that because this is like

a business and [she was] trying to … work with them and get this all straightened out and it's just extremely rude, demeaning …."

       b.    *Baha's account*

Baha testified that he invited Heitmeyer over to his house for breakfast or lunch, believing at that point that they had "good chemistry" and that she was interested in a personal relationship. When she arrived at his home and they sat at the kitchen table, Baha pushed away the papers that Heitmeyer had brought and did not look at them for another 30 to 45 minutes. During that time, they kissed once or twice.

At some point Baha went upstairs to use the master bathroom. When he returned, Baha approached Heitmeyer from behind and put his arms around her for a "very affectionate hug" that lasted only "a few seconds." Baha's intent was to be affectionate and romantic. He believed he had an erection, but it was not pressing against her body. He did not try to grope or touch her breasts or buttocks, force himself on her, rub his groin up against her, turn her around, forcefully kiss her, or try to restrain her. He neither intended to offend or harm Heitmeyer nor believed he had done so. She did not say "no."

Baha released Heitmeyer from the hug after a few seconds, and they went back to sitting at the table, smiling and socializing. He served Heitmeyer lunch, and she stayed at his home for another 30 to 60 minutes. She maintained a friendly demeanor and never indicated she was offended or upset with him.

During this time, Baha read the correspondence Heitmeyer had brought. He respected Hiibner, whose serious accusations against Heitmeyer—suggesting she was a "cheat" and "liar" and engaged in "extortion"—"grabbed [his] attention" and were

8

"concerning" to him. Heitmeyer indicated she wanted Baha to give her money for her company, which Baha thought was a "crazy" and "absurd" request—given the company's state—and caused him to believe Heitmeyer was "not interested in a personal relationship."

According to Baha, at no time during their three November 2017 meetings did Heitmeyer say anything to reject his advances or indicate that he had offended her.

5.   *Events after November 14 meeting*

Heitmeyer testified she did not remember "getting in the car and leaving or going home" on November 14. While driving home, at 12:14 p.m., Heitmeyer tried calling her boyfriend. Heitmeyer and her boyfriend eventually connected at 12:29 p.m. and again at 1:16 p.m., but neither recalled what they talked about. She then spoke on the phone with her website designer from 1:25 to 3:38 p.m. but did not recall what they spoke about either.

Heitmeyer testified she called her lawyer at some point, who advised her to record Baha.[1] In order to set up a possible recording opportunity, Heitmeyer texted Baha at 4:04 p.m., asking if he knew another Pasadena Angels member, Roberto Machado. An hour later, Baha replied that he did and offered to make an introduction.

Heitmeyer's boyfriend testified that when he returned home from work that evening, he saw Heitmeyer standing in their apartment, and she looked stunned and scared, but he did

---

[1]   This lawyer, Paul Levine, testified Heitmeyer told him Baha had assaulted her; Levine advised Heitmeyer to have another encounter with Baha and record him so she would have proof.

not recall what she said. He was mad at her because she had gone to Baha's house after Baha had hit on her on a previous occasion, so he did not want to hear what had happened. Heitmeyer later told her psychologist that her boyfriend arrived home that evening to find her lying in bed crying.

At 9:14 a.m. on November 15, Heitmeyer replied to Baha's text regarding Machado, stating she was LinkedIn friends with Machado and that she "messaged him but maybe he doesn't check it. Can you reach out to him? I'm updating my stuff … when do you want to look at it?!?!"—followed by a smiley-face emoji. Baha reached out to Machado, and Heitmeyer communicated with Machado for a few months.

On November 16, Heitmeyer texted Baha, "Breakfast tomorrow?" She testified that this was another attempt to set up a possible recording. Baha declined the proposal. He testified he had lost interest in Heitmeyer and decided to "move on" after learning about the seriousness of her conflict with Hiibner and concluding from her requests for money that she was not interested in a personal relationship.

Baha never again proposed to Heitmeyer that they get together. He texted her a final message the night of January 1, 2018, wishing her a happy new year, as he did with many of his contacts. At that time, Baha remained unaware that Heitmeyer planned to sue him.

6. *Evidence of Heitmeyer's emotional distress*

Heitmeyer testified that after the incident, she attempted to carry on with her life, but what happened with Baha "just kept eating [her] up." She continued to try to move forward with her business, but she had lost her drive to a large extent. She "just kind of crawled like into a shell" and lost a lot of friends. She

10

became less involved in her community and stopped calling her parents. She did not want to be intimate with her boyfriend. She had feelings of wanting to harm herself.

She tried going on antidepressants, but they did not work for her, and she sought out counseling. Heitmeyer's therapist, Lois Johnson, provided sexual abuse trauma counseling over 32 sessions between August 2020 and August 2021. Johnson testified that of the approximately 150 sexual abuse survivors she had counseled, Heitmeyer was "one of the top three most impacted." Johnson noted that in response to her trauma from the incident with Baha, "psychologically, emotionally, [Heitmeyer] really retreated, and physically she was not as active as she had been." Johnson found Heitmeyer to be "[emotionally] withdrawn and not as outgoing and happy," "nervous," "lack[ing] self-confidence," unable to "stay focused on thoughts," and "unsure of herself."

Heitmeyer was also evaluated by a retained expert forensic psychologist, Nancy Kaser-Boyd, who testified that Heitmeyer qualified for diagnoses of major depressive episode and post-traumatic stress disorder. Kaser-Boyd testified that Heitmeyer showed no signs of malingering or faking a mental disorder through her assessment using various diagnostic tests. Kaser-Boyd opined that the incident "profoundly affected" Heitmeyer, leaving her feeling "devalued" and shameful, "unable to concentrate very well," and "fearful [and] socially isolated because of her fear."

Heitmeyer testified that, even six years later, she still did not feel like herself, she was just going through the motions, and she lacked the passion she had for her company.

B.     *The Lawsuit and Trial*

In July 2018, Heitmeyer filed a lawsuit against Baha, Pasadena Angels, and Hiibner.  In the operative second amended complaint, Heitmeyer alleged causes of action against Baha for assault, battery, sexual assault and battery, gender violence under Penal Code section 243.4, violation of the Unruh Civil Rights Act under Civil Code section 52.1, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, invasion of privacy, fraud and deceit, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.).[2]  She sought punitive damages, among other relief.

In March 2023, Heitmeyer proceeded to trial on her causes of action for sexual battery and intentional infliction of emotional distress.[3]  After 10 days of testimony, the court granted Baha's motion for directed verdict as to punitive damages.  The jury returned a verdict in Baha's favor on both causes of action.  Regarding the sexual battery cause of action, 10 of 12 members of

---

[2]     Heitmeyer also raised some of these and other claims against Pasadena Angels and Hiibner, but each defendant was later dismissed and neither is a party to this appeal.

[3]     A first trial was held in October 2021, at which the jury found in Heitmeyer's favor on her sexual battery cause of action and Baha's favor on her battery and intentional infliction of emotional distress causes of action and claim for punitive damages.  Heitmeyer had previously dismissed her other causes of action with prejudice.  Heitmeyer did not appeal after the trial court granted Baha's motion for a new trial on the basis of a prejudicial evidentiary error.  She subsequently dismissed her battery cause of action with prejudice as well.

the jury answered "no" on the first question on the special verdict form, asking, "Did [Baha] intend to cause a harmful or offensive contact with [Heitmeyer's] sexual organ, groin, buttocks, or breast, and a sexually offensive contact resulted either directly or indirectly?" On the cause of action for intentional infliction of emotional distress, 10 jurors answered in the negative to the question, "Was [Baha's] conduct outrageous?"

The court entered judgment for Baha, and Heitmeyer moved for a new trial. The court denied the motion following a hearing. Heitmeyer timely appealed from the judgment.

## DISCUSSION

A. *Insufficient Evidence*

Heitmeyer argues the jury's verdict is not supported by sufficient evidence. " 'A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable.' [Citation.] A reviewing court will not independently review the record to make up for the appellant's failure to carry its burden on appeal. [Citation.] Failure to meet this burden waives any claim that the … jury's finding is not supported by substantial evidence." (*E.I. v. El Segundo Unified School Dist.* (2025) 111 Cal.App.5th 1267, 1285 (*E.I.*).)

Heitmeyer did not carry this burden here. In her opening brief, she notes there are "two conflicting accounts" of the alleged sexual battery and provides a short narrative describing each party's view as to their relationship in November 2017. She then summarizes only evidence corroborating her account. In so doing, she omits large portions of the relevant trial record, including any citation to or discussion of the parties' testimony

13

regarding what happened at Baha's home on November 14. She also fails to describe any evidence favorable to Baha and the judgment. As a result, Heitmeyer forfeited her claim of insufficient evidence.[4] (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [appellants must " 'set forth in their brief *all* the material evidence on the point, and *not merely their own evidence*' " and " '[u]nless this is done the error is deemed to be waived' "]; accord, *E.I., supra*, 111 Cal.App.5th at p. 1285.)

Moreover, even if we considered the challenge to the sufficiency of the evidence, we would find Heitmeyer could not meet her heavy burden on appeal. "Ordinarily, when an appellant contends there is insufficient evidence to support a finding of fact, we apply the substantial evidence standard of review." (*Pruchnik v. JCCP4621 Common Benefit Committee* (2025) 116 Cal.App.5th 35, 47.) "But where ' "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." ' " (*Id.* at pp. 47-48; accord, *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) "Instead, when an appeal turns on the appellant's failure of proof, ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's

---

[4] In her reply brief, Heitmeyer argues she did not forfeit her challenge based on the mention in her opening brief of "conflicting" accounts. But even in her reply brief, Heitmeyer still presents an account of the alleged sexual battery based solely on her own trial testimony.

evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Pruchnik*, at p. 48; accord, *Sonic Manufacturing Technologies, Inc.*, at p. 466.)

Heitmeyer had the burden at trial to prove Baha's conduct constituted sexual battery and intentional infliction of emotional distress.  Under Heitmeyer's theory of the case, Baha committed sexual battery by "act[ing] with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results." (Civ. Code, § 1708.5, subd. (a)(1); see *Jacqueline R. v. Household of Faith Family Church, Inc.* (2002) 97 Cal.App.4th 198, 208 [" 'A cause of action for sexual battery under Civil Code section 1708.5 requires the batterer intend to cause a "harmful or offensive" contact and the batteree suffer a "sexually offensive contact." ' "].) For purposes of the sexual battery statute, " '[i]ntimate part' means the sexual organ, anus, groin, or buttocks of any person, or the breast of a female."  (Civ. Code, § 1708.5, subd. (d)(1).) " 'Offensive contact' means contact that offends a reasonable sense of personal dignity."  (*Id.*, subd. (d)(2).)  The jury here concluded Heitmeyer failed to meet her burden to show Baha intended to cause a harmful or offensive contact with any of her intimate parts, causing a sexually offensive contact.

To state a cause of action for intentional infliction of emotional distress, the plaintiff must allege: " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the

15

emotional distress by the defendant's outrageous conduct.' " (*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 473-474; accord, *Sandoval v. Pali Institute, Inc.* (2025) 113 Cal.App.5th 616, 629.) The jury was instructed with CACI No. 1602 that " 'outrageous conduct' is conduct so extreme that it goes beyond all possible bounds of decency." The jury determined Heitmeyer did not meet her burden to show that Baha's conduct was outrageous.

Heitmeyer has not shown her evidence at trial supporting the two causes of action was uncontradicted and left no room for the jury's findings; rather, Heitmeyer concedes the parties presented conflicting accounts of what happened at Baha's home on November 14. Baha testified that he believed he and Heitmeyer were at the beginning of a possible romantic relationship; they had previously kissed and been affectionate and Heitmeyer gave him no indication his advances were unwelcome; when they were at his house on November 14, he kissed her with no objection from her; when he hugged her from behind, it was a brief hug intended to be romantic and affectionate; he did not come in contact with any of her intimate body parts; and afterwards they went back to socializing and smiling.

Heitmeyer contends Baha "presented no documentary or testimonial evidence to corroborate" his version, while she "presented a myriad of corroborating evidence," both documentary and testimonial evidence from her attorney and a psychologist, that her relationship with Baha was "exclusively about business," that Baha had showed interest in assisting her with her business, and that Baha sexually battered her when she went to his home with her business documents, ready for a

16

weekly meeting.  Heitmeyer contends "it is simply implausible" that a reasonable person could believe Baha's version, given the absence of any "written gesture of affection" from Baha to her.

Heitmeyer essentially asks us to reweigh the evidence. However, we may not do so.  (*DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 195 ["on appeal we cannot reweigh the evidence"].)  "The testimony of witnesses who were apparently believed by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions."  (*Ibid.*; accord, *People v. Cantrell* (1992) 7 Cal.App.4th 523, 538 [" ' " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category.  [Citation.]  To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' "].)  The testimony of a single witness is sufficient to support a jury's findings, and no written corroboration is typically required.  (Evid. Code, § 411; *Newman v. Casey* (2024) 99 Cal.App.5th 359, 375; *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 119.)  Baha's testimony is not so inherently improbable that we may disregard it.

17

The evidence does not compel a contrary verdict in Heitmeyer's favor as a matter of law.  (See *Pruchnik v. JCCP4621 Common Benefit Committee*, *supra*, 116 Cal.App.5th at p. 48.)

B.      *Evidentiary Error*

Heitmeyer argues the court erred in not excluding photographs of her socializing and looking happy under Evidence Code section 352 (section 352).  She asserts the photos "were taken in settings other than where the incident occurred, with individuals other than [Baha], more than a week after the incident" and "[i]n some instances, as far out as 2019."  She contends that admission of the photos was unduly prejudicial "because the way in which sexual assault victims process the assault is still largely misunderstood."  She asserts that "[b]y displaying these photographs as evidence to discredit the sexual assault and the resulting emotional distress," the court invited the jury to not "tak[e] the sexual battery seriously" and to "punish[] [her] for not responding or reacting to the assault in the way a 'true' victim is 'supposed to' react."  Heitmeyer further asserts that "[t]he concept that pictures taken for publicity for [her] skincare company reveal the true emotional state of a sexual battery victim at any point in time is discriminatory, biased, outdated, and highly prejudicial."

Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice."  We review a trial court's decision to admit or exclude evidence, including under section 352, for abuse of discretion.  (*People v. Peoples* (2016) 62 Cal.4th 718, 743; *Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996,

18

1000.) " ' "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 803.)

Before trial, Heitmeyer filed a motion in limine seeking an order prohibiting Baha from "entering photographs of [her] into evidence to argue her emotional state around the time of the assault." Baha contended the photos were relevant to Heitmeyer's alleged emotional distress. The court denied the motion, explaining it needed to see the individual photos and their foundation before it could conduct a section 352 analysis.

During Heitmeyer's cross-examination at trial, Baha presented numerous photos of Heitmeyer that had been posted on her social media account. Heitmeyer's counsel objected to some of the photos, sometimes citing section 352 as a basis for the objection. The court indicated the photos were generally relevant because "it came in that [Heitmeyer's] in bed, she can't get up"; in other words, Heitmeyer put her emotional well-being at issue by seeking damages for emotional distress, and the photos were relevant to whether Heitmeyer experienced the severe and ongoing emotional distress she alleged. However, the court ultimately excluded some of the photos on section 352 grounds.

Social media posts with photos that were published to the jury over a section 352 objection include a March 28, 2019 post with a photo of Heitmeyer outside wearing a sunhat and sunglasses, with a wide smile and holding a dog. Heitmeyer testified the photo was taken at the flower fields in Carlsbad on a day trip with her daughter and boyfriend. Another post dated

19

July 7, 2019, includes a photo showing Heitmeyer wearing a bathing suit in a hot tub with another woman Heitmeyer identified as a celebrity, bearing a caption, "Sunbaes are made for sipping wine with besties." A post dated October 1, 2019, includes a photo of Heitmeyer striking a pose in high heels while lounging in a chair, with a serious expression on her face, and another dated October 27, 2019, includes a photo depicting Heitmeyer on the hood of a car, with bare legs and wearing heels.[5] A December 31, 2019 post includes a photo showing her kissing a man on the cheek in front of a Christmas tree, with holiday greetings in the caption; Heitmeyer testified it was taken at her parents' house in Ohio.

These photos had some probative value to dispute Heitmeyer's testimony that she had withdrawn into a shell and was suffering from emotional distress after the sexual battery by Baha. Although Heitmeyer takes issue with the fact that some of the photos were taken in 2019, two years after the incident, Heitmeyer testified that she continued to experience emotional distress up until the time of trial; thus, even photos from 2019 were relevant to the question whether she was experiencing such distress. Of course, Heitmeyer is correct that photos posted on social media feeds do not necessarily accurately reflect the well-being of the person depicted. That Heitmeyer was smiling in a

_____

[5]     In her reply brief, Heitmeyer contends for the first time that the court improperly admitted these social media posts because they showed Heitmeyer in a bathing suit or wearing high heels. "We do not consider arguments made for the first time in a reply brief, primarily because it denies respondent the opportunity to counter the argument." (*LAOSD Asbestos Cases* (2026) 118 Cal.App.5th 1041, 1060.)

photo or on a trip to see flowers did not mean she was not suffering. But the photos were not inherently embarrassing and were not likely to cause jurors to be biased against Heitmeyer. (See *Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 150 [" ' " 'The "prejudice" referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' "]; accord, *People v. Tran* (2011) 51 Cal.4th 1040, 1048.) The trial court did not abuse its discretion in determining the probative value of the photos outweighed any prejudicial effect.

C. *Defense Counsel Misconduct*

Heitmeyer argues the judgment must be reversed because Baha's counsel committed misconduct at trial.

    1. *Applicable law*

Attorney misconduct is an "irregularity in the proceedings" that may provide grounds for reversal of the judgment. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 (*Garcia*); see *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*) ["The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury."].) In addition to showing misconduct, the party seeking such relief "must demonstrate that the misconduct was prejudicial." (*Garcia*, at p. 149.) To do so, the party must show that, based on the entire case, "it is reasonably probable [she] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802 (*Cassim*).) A reviewing court makes " 'an independent determination as to whether the error was

prejudicial' " and "must examine 'the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument,' in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice." (*Garcia*, at p. 149.)

" 'Generally, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial.' " (*Cassim, supra*, 33 Cal.4th at p. 794; accord, *E.I.*, *supra*, 111 Cal.App.5th at p. 1290.) The party raising the alleged misconduct must also have moved for a mistrial or asked the court to admonish the jury. (*Cassim*, at p. 794; *E.I.*, at p. 1290.) "The failure to timely object and request an admonition waives any claim of error unless the complaining party can show that the misconduct was so prejudicial that it could not be cured by an admonition, an objection or request for admonition would have been futile, or the court promptly overruled an objection and the objecting party had no opportunity to request an admonition." (*E.I.*, at pp. 1290-1291; accord, *Cassim*, at pp. 794-795.) " 'The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial.' " (*Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 604.) " ' "Attorney misconduct is incurable only in extreme cases." ' " (*E.I.*, at p. 1291.)

2. *Speaking objections*

Heitmeyer first contends defense counsel engaged in misconduct by twice making a meritless speaking objection to a preapproved exhibit in violation of a court order. The first

22

objection was to the presentation of an exhibit in Heitmeyer's opening statement that showed a January 2017 text from Heitmeyer to Baha. Defense counsel objected she had not previously been shown the exhibit. The court admonished defense counsel in the presence of the jury that speaking objections were not proper. Defense counsel apologized before the jury, and during a subsequent sidebar said her memory had been faulty. The court then overruled the objection in open court, and Heitmeyer's counsel continued his opening statement.

Even assuming the objection constituted misconduct, Heitmeyer has not shown such misconduct was so prejudicial as to warrant reversal of the judgment. (See *Garcia, supra,* 204 Cal.App.4th at p. 149 [in addition to showing attorney misconduct, a party "must demonstrate that the misconduct was prejudicial"]; accord, *Martinez, supra,* 238 Cal.App.4th at p. 568 ["Obviously attorney misconduct is more common than *reversal* for attorney misconduct. Prejudice must be shown."].)

Defense counsel's second speaking objection was to Heitmeyer's presentation of a portion of Baha's taped deposition. After defense counsel objected, stating, "[t]here was an order not to play that," the court indicated it would review the matter later and instructed Heitmeyer's counsel to continue playing the video. When the matter was revisited after the jury was excused, defense counsel withdrew the objection.

Heitmeyer did not object to defense counsel's second speaking objection or seek a curative admonition for the alleged misconduct. Heitmeyer asserts she "was not required to preserve the objection[] because the conduct complained of constituted [a]

23

fundamental error[].”[6]  She provides no authority or analysis to support this assertion.  Heitmeyer forfeited the misconduct claim. (*E.I.*, *supra*, 111 Cal.App.5th at p. 1290.)

        3.     *Court order regarding Heitmeyer's other litigation*

Heitmeyer next argues defense counsel "impugn[ed]" her character by violating the court's in limine order excluding evidence regarding her other litigation, including Heitmeyer's suit against Hiibner and a related malicious prosecution claim brought by Hiibner against Heitmeyer and her counsel.  Before trial, the court ordered that defense counsel "was not precluded entirely from mentioning [Heitmeyer's] other litigation, but she was precluded from delving into the details of those lawsuits." After defense counsel expressed confusion over the in limine order at trial, the court indicated counsel was "allowed to go into to some degree the other lawsuits that were going on, just not in great detail."  The court added that evidence of the other lawsuits was relevant to show that Heitmeyer's emotional state may have been attributable to the stressors from those other lawsuits, some of which did not go well.

Heitmeyer argues defense counsel "over-stepped and violated" this order during her cross-examination. First, Heitmeyer contends defense counsel improperly used her responses to interrogatories propounded by Hiibner as a trial exhibit because the responses "discussed damages related to the claim against Hiibner, including lost income, which was not part of the case against [Baha]."  However, Heitmeyer's counsel did

_____

[6]      Heitmeyer does not argue that objecting to the alleged misconduct would have been futile or that she had no opportunity to request an admonition.  (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 286.)

24

not object to the introduction of the responses into evidence. (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.) Nor does Heitmeyer provide any argument for why the information in the responses was prejudicial. (*Martinez*, *supra*, 238 Cal.App.4th at p. 568.)

Heitmeyer also argues defense counsel improperly asked if Heitmeyer had ever represented herself in a lawsuit Hiibner filed against Heitmeyer and her former attorney. Heitmeyer answered ("Sort of") and did not object to this question. Thus, she forfeited any argument that this question was improper.

Heitmeyer further contends defense counsel improperly sought to follow up on Heitmeyer's testimony that the litigation involving Hiibner had been a "win-win," which counsel believed to mean Heitmeyer's former attorney had settled the lawsuit by paying Hiibner and then gave Heitmeyer "a little money, too." The court acknowledged Heitmeyer had opened the door to such inquiry but replied, "I wouldn't say a little," and later ordered that questioning could not get into "dollar amount details." Defense counsel subsequently asked Heitmeyer to confirm that her former attorney "paid money to Ms. Hiibner" and "a little money to you." Heitmeyer answered "yes" to both questions without objection. The court intervened when defense counsel next asked Heitmeyer if she was paid "significantly less" than Hiibner, explaining it was not relevant. Defense counsel withdrew the question. Defense counsel later asked Heitmeyer whether her use of the phrase "win-win" referred to Hiibner receiving money and Heitmeyer receiving "a little money" in relation to the separate lawsuit. The court again intervened, explaining Heitmeyer had used the phrase to refer to both Hiibner and herself receiving money and that the amounts

25

received were not relevant.  No further questions were asked on the matter.

While Heitmeyer asserts defense counsel's questions violated the in limine order regarding her other litigation, she forfeited any claim of prejudicial misconduct by not objecting to the questions as alleged misconduct or seeking admonitions beyond the trial court's interventions.  (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.)  Moreover, the record shows any threat of prejudice from these questions was mitigated by the court's responsive interventions to sustain relevance objections and prevent further questioning.[7]

---

[7] Heitmeyer also complains defense counsel improperly asked Heitmeyer if her former attorney withdrew from representing her in the suit against Baha.  While Heitmeyer did not object to the question, the court sustained her relevance objection to the next question:  "And then you got a new lawyer; correct?"  Heitmeyer forfeited any claim of misconduct by not additionally seeking a curative admonition in the trial court. (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.)  Heitmeyer also does not explain how she was prejudiced aside from asserting defense counsel was "insinuating that [her] prior attorney must have left because of the merits of her case."  This is insufficient to demonstrate prejudice.  (See *Martinez*, *supra*, 238 Cal.App.4th at p. 568 ["Prejudice must be shown."].)

In addition, Heitmeyer asserts defense counsel made "unsupported" accusations in asking Heitmeyer whether Hiibner said she did not invest "the last $25,000 of her $100,000 commitment" because "she thought [Heitmeyer] had misrepresented [her] financials."  Heitmeyer answered yes, without objection.  Defense counsel next asked Heitmeyer whether Hiibner said she was not going to invest the additional $25,000 because Heitmeyer had "commingled" company money

26

### 4. *Police report questions*

Heitmeyer argues defense counsel improperly questioned her about whether her attorney had advised her to file a police report about the alleged sexual battery. The court sustained Heitmeyer's relevance objection. It then sustained its own relevance objection when defense counsel asked Heitmeyer whether she accompanied one of her attorney's employees to the police station. Despite these sustained objections, Heitmeyer at no point sought a curative admonition for alleged misconduct and thus forfeited the claim that defense counsel's questions constituted prejudicial misconduct. (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.) And despite claiming defense counsel's questions were "objectionable" and left "[b]ad insinuations," Heitmeyer also provides no prejudice analysis to support her argument. (*Martinez*, *supra*, 238 Cal.App.4th at p. 568.)

### 5. *Court order regarding legal funding*

Heitmeyer argues defense counsel violated the court's order not to introduce, without prior leave of the court, evidence of any funding Heitmeyer may have sought or received to support her litigation against Baha. Defense counsel asked Heitmeyer's physician whether a "me too" notation in Heitmeyer's medical records referred to legal fees causing Heitmeyer to experience stress and depression. Heitmeyer did not object to this questioning or request a curative admonition and thus forfeited

---

with her own and used it for personal purposes. Heitmeyer objected on hearsay and section 352 grounds, but the court overruled Heitmeyer's objection and Heitmeyer responded Hiibner already knew the situation with the funds and that the "funds had to be that way." Heitmeyer has not demonstrated the court improperly overruled the objections, and she has not demonstrated how the questions were prejudicial.

the argument.  (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.)
In any event, the question about how Heitmeyer's legal fee bills
were affecting her emotionally did not pertain to the source of the
funding for her fees.  Heitmeyer has not shown misconduct.

      6.     *Baha's testimony regarding his wife and children*

      Heitmeyer contends defense counsel improperly elicited
testimony from Baha about his wife, daughter, and son.  The
court sustained Heitmeyer's section 352 objection during opening
statements when defense counsel described the car accident that
killed Baha's wife.  In so doing, the court stated, "the objection is
sustained for this part of the trial."

      During Baha's direct examination, defense counsel
prompted Baha to share "what happened" on the date of the fatal
accident.  The court sustained another section 352 objection, and
a lengthy sidebar ensued, in which the court explained the details
of the accident and its aftermath were substantially more
prejudicial to Heitmeyer than probative of Baha's case.  The court
ordered defense counsel not to go into details of the accident and
to ask Baha only questions regarding the effect the accident had
on him.

      After the sidebar, and with the court's permission, defense
counsel read Heitmeyer's deposition testimony explaining Baha
had spent most of their first meeting at the coffee shop talking
about the personal difficulties he was experiencing since the
accident.  Defense counsel then asked Baha why he discussed
these matters with Heitmeyer.  The court sustained Heitmeyer's
section 352 objection when Baha started to go into details about
his son's mental health and its relation to his wife's death.
Defense counsel moved on to a different line of questions.

Heitmeyer forfeited her challenge by not seeking a curative admonition for the misconduct she now claims. (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291.) She also has not shown defense counsel violated the court's rulings by asking questions during Baha's testimony. And even if misconduct were shown, Heitmeyer has not demonstrated she was prejudiced given the court sustained her section 352 objection as soon as Baha's testimony verged into matters the court had ordered excluded.

7. *Other "false assertions"*

Finally, Heitmeyer asserts defense counsel confused or misled the jury with numerous "false assertions in her questioning." The only record citations Heitmeyer provides for these additional claims are to a colloquy outside the presence of the jury that addressed defense counsel's questions to Heitmeyer that incorrectly suggested she saw a particular doctor the day after the incident. While Heitmeyer's counsel requested an admonition be given, defense counsel explained that her "recollection got confused" and that Heitmeyer's deposition testimony instead showed she called the doctor on the day of the incident but made an appointment for the following week and that she saw a different doctor the day after the incident. Defense counsel offered to "clear it up," which the court accepted without further objection from Heitmeyer's counsel. When defense counsel later asked Heitmeyer questions to elicit testimony confirming the correct information, counsel admitted she was "wrong" in previously suggesting Heitmeyer had seen the particular doctor the day after the incident.

Heitmeyer does not show she objected to or sought an admonition for any of the other alleged instances of misconduct. (*E.I.*, *supra*, 111 Cal.App.5th at pp. 1290-1291; see also *Meridian*

29

*Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 ["arguments that are not ... supported by adequate citations to the record [may be deemed] waived"].) Nor does she make any case of prejudice from any of the "false assertions" beyond speculating that the "misconduct caused one or more jurors to either rely on false information, or give up any effort to properly and objectively listen to [her] case." Heitmeyer therefore is not entitled to her requested relief. (*Martinez*, *supra*, 238 Cal.App.4th at p. 568.)

## DISPOSITION

The judgment is affirmed. Baha shall recover his costs on appeal.


                                                STONE, J.

We concur:


MARTINEZ, P. J.


FEUER, J.